STATE of Missouri, Respondent,

v.

Robert BAKER, Appellant.

No. 63244.

Supreme Court of Missouri,
En Banc.

Aug. 23, 1982.

Rehearing Denied Sept. 13, 1982.

James C. Jones, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Kelly Klopfenstein, Asst. Atty. Gen., Jefferson City, for respondent.

DONNELLY, Chief Justice.

Appellant Robert Baker was convicted of capital murder by a jury in the Circuit Court of the City of St. Louis and was sentenced to death. Following rendition of judgment and imposition of sentence, an appeal was perfected to this Court. This Court has exclusive appellate jurisdiction under Mo.Const. art. V, § 3.

Gregory Erson was a police officer in the City of St. Louis. On June 19, 1980, he was assigned to work at the "Stroll", a high crime area, as an undercover agent on the prostitution detail. He drove an unmarked automobile, and wore blue jeans and a softball shirt.

Appellant was also in the area of the "Stroll" on the evening of June 19, 1980. He and companions, including Leslie Lomax, were driving around the area in a pickup truck. They were seeking robbery victims so they could obtain money to purchase illegal drugs. At approximately 11:30 p. m. appellant and the others noticed Erson's car parked on Westminster near the corner of Westminster and Whittier. As

they passed the car, they saw Erson in it and decided to make him their victim. They made a right turn off Westminster onto Whittier, and parked the truck out of Erson's view. Lomax then left the truck and went over to talk with Erson. Upon returning to the truck, he told the others that Erson had money because he said he wanted a "date." Lomax and appellant approached the automobile—Lomax on the driver's side and appellant on the passenger side. The windows of the front doors were open. According to appellant's confession, he shot Erson.

The police arrived at the scene soon after the shooting. Erson was found slumped over in the front seat of the car. His police radio was partially visible, although he was lying on it. His police department revolver was missing. Erson's revolver had been used to shoot him in the back near his right armpit. The bullet passed through his body in a downward path, cutting through his heart and right lung. He died of massive internal bleeding.

*Appellant first contends the trial court erred in failing to give an instruction on murder first degree.*

■ Appellant asserts the trial court erred in failing to instruct on first degree murder because *State v. Gardner*, 618 S.W.2d 40 (Mo.1980), requires that such an instruction be given where the evidence supports it. The specific question here is: Assuming sufficient evidence, it is error, when only capital murder is charged, to fail to submit a first degree murder instruction in a trial for capital murder *committed after January 1, 1979?* The answer is "no." *Gardner* does not control this case. *Gardner* does not stand for the proposition that first degree murder is a lesser included offense of capital murder under the New Criminal Code. The crime in *Gardner* was committed August 31, 1978. *See State v. Mercer*, 618 S.W.2d 1, 3 (Mo. banc 1981). The effect of § 556.031, RSMo 1978, is that crimes committed prior to January 1, 1979, are not governed by the Code. § 556.031.1 and .3. Section 556.220, RSMo 1969 (repealed), governed what was a lesser includ-

ed offense of capital murder in *Gardner*. *Gardner* necessarily held that under § 556.-220 (repealed), first degree murder was a lesser included offense of capital murder because it was an "offense inferior to that charged in the indictment." § 556.220. This was a correct declaration of the law which controlled the holding in *Gardner*.

Is first degree murder a lesser included offense of capital murder under § 556.046, RSMo 1978? Section 556.046 provides in pertinent part as follows:

"1. A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It is specifically denominated by statute as a lesser degree of the offense charged...."

■ This Court has recognized that an offense can be a lesser included offense of another either: (1) when its elements are necessarily included therein, or (2) when by statute it is specifically denominated as a lesser degree of the offense charged. *State v. Wilkerson*, 616 S.W.2d 829, 833 (Mo. banc 1981). The "elements test" requires that the lesser offense be established by proof of the same or less than all the facts required to prove the greater offense. *State v. Smith & Hodges*, 592 S.W.2d 165 (Mo. banc 1979). First degree murder in Missouri requires proof of commission of a felony; capital murder does not. Therefore, first degree murder is not a lesser included offense of capital murder on their elements. Nor can first degree murder be described as "specifically denominated by statute as a lesser degree" of capital murder. *Cf. Wilkerson, supra.* Consequently, under § 556.-046, RSMo 1978, first degree murder is not a lesser included offense of capital murder.

In further support of this conclusion, it is noted that the General Assembly has, concurrent with the change brought about by § 556.046.1(2), made a change in what of-

fenses the trier of fact in a capital murder case is to consider. Section 565.006.1, RSMo Supp.1979, no longer requires, as did § 565.-006.1, RSMo 1978, that the trier of fact in a capital murder case consider "whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, [or] manslaughter." *See* Historical Note to § 565.006.1, RSMo Supp. 1979.

█ Having ruled that first degree murder is not a lesser included offense of capital murder, we must then determine the constitutional viability of the resulting instructional scheme in light of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). *Beck* requires that the trier of fact in a capital murder case be allowed to consider lesser included offenses supported by the evidence. *Cf. Hopper v. Evans,* —— U.S. ——, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). The *Beck* requirement prevents the jury from being in an "all or nothing" situation in which it might err on the side of conviction. Although *Beck* is not precisely on point, due to the fact that first degree murder is not a lesser included offense of capital murder in Missouri, examination of the elements of the homicides, notably the mental states, illustrates that it is second degree murder, not first degree murder, which would sufficiently test a jury's belief of the crucial facts for a conviction of capital murder. *See* § 565.001, RSMo 1978; § 565.003, RSMo 1978; § 565.-004, RSMo 1978; *State v. Franco,* 544 S.W.2d 533, 535 (Mo. banc 1976), *cert. denied* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1976). Therefore, omitting first degree murder from the instructional scheme, where only capital murder is charged, does not run afoul of *Beck.*

*Appellant next contends the trial court erred in overruling his motion to suppress his confession because the prosecution failed to sustain its burden of proving by a preponderance of the evidence that the confession was made freely and voluntarily and that it was not obtained through physical abuse of appellant by police officers.*

Appellant presented evidence at a pretrial hearing on a motion to suppress two recorded statements he gave to police. One statement was taken June 20, 1980, and the other was taken June 22, 1980.

At the hearing on the motion to suppress, photographs of appellant, taken on the morning of June 23, 1980, by an investigator for the Public Defender Bureau, were introduced to show the extent of his injuries. Appellant's sister testified that she saw appellant on the evening of June 22, 1980, and that he showed her injuries on his back and face and told her that he confessed on June 20 because the police beat him. Medical records from the St. Louis City Jail showed that on June 23, 1980, defendant complained of "bruises and three abrasions on the back," a scratch on his neck, and "generalized aching."

Appellant testified at the hearing that on June 20 he was beaten by numerous officers in Interview Room One; that they never informed him of his *Miranda* rights until the confession was taped; that within a few minutes of his arrival at Room One they handcuffed him to a chair, kicked him, slapped him, pulled his hair, burned his arms with cigarettes, yelled at him, and knocked him out of the chair; that the only reason he confessed was because of the beating; that he "made up" some things in the confession that he thought they would want to hear; that Detective Fletcher knew that the beatings were going on and that he advised appellant to confess. Appellant also testified that he was beaten by police on June 20 after he gave the confession, but that he was actually beaten only on that day. Appellant stated that on June 21 police threatened him; that on June 22 police took another taped statement from appellant, forcing it from him with threats of more beating. On cross-examination, appellant testified that upon his arrival at police headquarters on June 20, news and media personnel filled the corridor immediately outside Room One where he was questioned.

Officers Fletcher and Crews testified for the State. Fletcher, who brought appellant

in, testified that upon picking up appellant he informed him of his rights but did not interrogate or question him; that he took him to Interview Room One and left him there with Officers McCoy and Crews; that in the corridor outside Room One there were many newsmen; that he did stick his head in Room One a few times to see how things were progressing; that he only talked to appellant to ask him how things were going on those occasions; and that he knew nothing of the alleged beating. Officer Crews, one of the officers who questioned appellant, testified that he and Officer McCoy advised appellant of his *Miranda* rights when he arrived at the interviewing room; that appellant arrived at approximately three o'clock in the afternoon; that Room One is located directly south of the corridor leading to it, with one interior wall separating it from the corridor; that air vents run from the interviewing room out to the corridor; that he did not, nor did Officer McCoy, beat or threaten appellant in any way; that he told appellant that he had been named or implicated by Lomax and that "if he wanted to give his account, we would tape it"; that appellant made a statement, which was recorded; that the reporters and television cameras were still out in the hall after they had questioned appellant and that they walked with appellant past them; that he was then taken down and booked. Officer McCoy was unable to testify at the hearing due to hospitalization.

During the hearing the court thoroughly questioned appellant as to his alleged injuries and questioned Officer Crews as to the details of the recording of the June 20 statement. The court also made specific findings with respect to the photographs introduced by appellant. Reviewing all the evidence, the court, in detailed findings, determined that appellant was not beaten prior to the June 20 recorded statement, and that appellant was advised of his rights and was aware of them prior to giving the statement. The court overruled appellant's motion to suppress the June 20 statement. With respect to the June 22 recorded statement, the court noted that the State of-

fered no evidence to rebut appellant's allegations that it was obtained by threats of violence. The court sustained the motion to suppress with regard to the June 22 statement and declared it inadmissible.

At the trial, appellant renewed his motion to suppress. The trial court concurred with the rulings made by the court sitting at the suppression hearing, and the June 20 tape was played to the jury.

■ When a confession is obtained from a person while in custody, the State must prove, once the issue of admissibility is raised, that it has complied with *Miranda* and that the statement was voluntary. *State v. Olds*, 569 S.W.2d 745, 751–752 (Mo. banc 1978). The voluntariness of the confession must be established by a preponderance of the evidence. *Id.* Moreover, where there is conflicting evidence offered in a motion to suppress concerning the voluntariness of a statement, and that statement has been ruled by the trial court to be admissible, it is a matter of discretion not lightly disturbed. *State v. Flowers*, 592 S.W.2d 167, 170 (Mo. banc 1979). We are not warranted, on the record in this case, in overturning the finding of the trial court.

*Appellant next contends the trial court erred in overruling his motion to limit cross-examination by barring the prosecutor from impeaching appellant by evidence of prior convictions.*

■ In his motion for new trial, appellant raised error regarding the use of the prior convictions to impeach him during his testimony. Now, on appeal, appellant employs a new theory on this point. He asserts that the "Missouri practice of admitting evidence of prior convictions for impeachment purposes deprived [him] of constitutional due process of law and of equal protection of the laws under the Fourteenth Amendment of the United States Constitution, in that it permitted the prosecutor to present, at the guilt stage of the trial, evidence which was relevant only to the punishment stage of the trial."

The trial court ruled correctly on the allegation of error presented. This Court

has uniformly held that § 491.050, RSMo 1978, pertaining to the use of prior convictions to affect a witness' credibility, "confer[s] an absolute right to show prior convictions ... for the purpose of impeachment." *State v. Busby*, 486 S.W.2d 501, 503 (Mo.1972). *See also, State v. Toliver*, 544 S.W.2d 565, 568 (Mo. banc 1976).

■ Appellant failed to preserve his claims that his rights to due process and equal protection were violated by not presenting them to the trial court. This Court has authority, under Rule 30.20, to consider "plain error." Having thoroughly reviewed the record and circumstances of this case, we do not find that manifest injustice or a miscarriage of justice has resulted.

*Appellant next contends this Court on review of the death sentence should rule that the evidence fails to support a finding by the jury of the aggravating circumstance that the capital murder was committed against a peace officer while engaged in the performance of his official duty.*

■ Appellant takes issue with this aggravating circumstance which allowed the jury to consider that "capital murder was committed against a police officer ... while engaged in the performance of his official duty," as set out in § 565.012.2(8), RSMo 1978. He asserts: (1) this aggravating circumstance should be interpreted to require that an accused knows that the victim is a peace officer because otherwise the "*mens rea* is absent," and (2) the State failed in this case to sufficiently prove that appellant knew this.

Appellant's assertion is without merit. There was a police radio on the front seat of the car. Ballistics evidence showed that Erson was shot with the revolver issued to him by the police department. The evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that appellant knew Erson was a police officer. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In view of these facts, coupled with evidence that the *Liverpool* doctrine of prudential restraint

may have recovered some degree of respectability, *see New York v. Ferber*, —— U.S. ——, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) we decline to address the unscrutable question of *mens rea*. *See Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

■ *Appellant next contends the trial court erred (1) in submitting to the jury as an aggravating circumstance the question of whether appellant murdered Gregory Erson for the purpose of receiving money or any other thing of monetary value, and (2) in submitting to the jury Instruction No. 20 because said instruction listed appellant's prior convictions as aggravating circumstances which the jury should consider in assessing punishment.*

Resolving these two issues would be fruitless because neither of these aggravating circumstances was chosen by the jury. Therefore, even if these points of error were ruled in appellant's favor, they would not "taint the proceedings so as to invalidate the ... aggravating circumstance found and the sentence of death based thereon." *Cf. State v. Mercer*, 618 S.W.2d 1, 10, n.5 (Mo. banc 1981); *Accord Stevens v. State*, 247 Ga. 698, 278 S.E.2d 398, 407 (1981).

*Appellant finally contends the Circuit Court erred in denying his motion to quash the indictment.*

■ In his motion to quash, appellant alleged that discrimination was practiced by a systematic exclusion of blacks and women from serving as grand jurors and as grand jury foremen in the City of St. Louis. Appellant contends he was thereby denied his constitutional rights both to equal protection under the law and to a grand jury composed of a fair cross-section of the community.

The motion to quash consolidated, at the circuit court level, over one hundred cases with the same allegations regarding the same grand jury; all the movants were indicted by the grand jury for the August 1980 term. After a hearing was held, the

trial court, in a detailed order, denied the motion. Appellant stipulated with the State to allow his appeal of this order to be consolidated in *State v. Payne*, No. 63196, presently pending in this Court. In the interest of judicial economy, the issues are addressed and resolved in this cause.

"In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. (Citations omitted). Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. (Citations omitted). Finally, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Id.* "Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case." *Id.*, at 495, 97 S.Ct. at 1280. It should be noted, however, that "a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which . . . jurors are drawn." *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). Nor does he have a right to demand that members of his race be included on the grand jury that indicts him. *Alexander v. Louisiana*, 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1971). But he is, of course, entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice. *Id.*

The *Castaneda* equal protection test, *supra*, also applies to the selection of grand jury foremen. *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3004, 61 L.Ed.2d 739 (1979).

The parties have entered into a stipulation on the exclusion of blacks, which states: (1) the composition of the grand jury pool in February 1980, was 23.6% black; in March 1981, it was 23.3% black; and in April 1981, it was 23.5% black; (2) the parties stipulated to the composition of twelve grand juries which sat from February 1978, to August 1980. In the August 1980, grand jury, four of the twelve regular grand jurors were black (33.33%), five of the sixteen regulars and alternates were black (41.25%), and the foreman was black. Moreover, this grand jury had seven women and five men as regulars, two women as alternates, and a female foreman. Statistical evidence at the hearing established the following: (1) of those persons who are twenty-one and older in the City of St. Louis, blacks constitute 38.5%; (2) women in the City of St. Louis constitute approximately 56.7% of the residents who are twenty-one and older; and (3) over the two-and-one-half year period (February 1978 to August 1980), blacks made up 26.3% of grand jurors who served as regulars and alternates.

At the hearing, the State showed that eighty percent of the names in the grand jury wheel consist of names drawn from the petit jury wheel, which is compiled by referring to voter registration and drivers' licenses; that at no phase of the selection process were indicators of race present on any of the cards, ballots, or questionnaires which contained eligible jurors' names. Numerous circuit judges testified there was no uniform method for selecting jurors from the venire, but that they did look for certain qualities in a grand juror, such as "greater than average maturity, responsibility and interest in the administration of justice . . . ." The judges sought leadership qualities in a foreman; they stated that most people did not want the responsibility of being foreman. Furthermore, the judges observed from experience that the types of

jobs which blacks typically held did not allow them to serve as a grand juror for the required time (two days a week for three months plus special sessions); a large percentage of blacks requested to be excused from service for employment reasons. The judges compared this to other employees whose employers would allow them time off from work without firing them plus would pay them for the time they served as a grand juror. This testimony was supported by Professor John Farley, who testified that due to educational weaknesses, the black population of St. Louis City held a disproportionately small percentage of the jobs with the economic security and fringe benefits which would permit them to be absent from work without sustaining financial hardship. The judges also testified that they did not deliberately exclude blacks from the grand juries, but, to the contrary, made affirmative efforts to increase the percentage of blacks thereon.

■ For several reasons appellant has failed on his equal protection claims. First, he has not established the required degree of underrepresentation. Considering, as we must, all persons twenty-one years old or older to be presumptively eligible for grand jury duty, *Alexander v. Louisiana*, 405 U.S. at 629, 92 S.Ct. at 1224, the relevant proportion of the St. Louis population is 38.5%. In the context of the equal protection claim, this percentage is to be compared with the "proportion called to serve as grand jurors over a significant period of time." *Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280. Blacks constituted 26.3% of all grand jurors who served on the juries whose composition defendant introduced into evidence. In this case the disparity between these is 12.2%. There is no mathematical standard for systematic exclusion; each case must consider all explanatory factors. *Alexander v. Louisiana*, 405 U.S. at 640, 92 S.Ct. at 1230. However, the United States Supreme Court has stated that it cannot be said that "purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in the community is underrepresented by as much as 10%." *Swain v. Alabama*,

380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965). The Court has also articulated that even a case involving a 40% disparity might be explained with proper rebuttal evidence. *Castaneda v. Partida*, 430 U.S. at 499, 97 S.Ct. at 1282. Smaller disparities have been held sufficient when they occurred with a selection process that was not racially neutral. *See, e.g., Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1965) (a 14.3% disparity with a selection process which indicated the race of eligible persons and where blacks were consistently weeded out in that process).

Moreover, the two and one-half year span of time involved here does not satisfy the "significant period" requirement. For instance, in *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), testimony was that no black had served on a grand jury or petit jury in the county within the memories of witnesses 50–75 years of age, and the Court condemned the "long-continued, unvarying and wholesale exclusion of negroes from jury service"; in *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), the Court examined a five-year span encompassing 21 grand juries; in *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), the evidence was that no one with a Mexican or Latin surname had served on any jury for 25 years; in *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), the relevant time period was eighteen years; in *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1949), the Court observed the systematic exclusion of blacks during a seven-year span; and in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498, the time frame was eleven years.

■ The third prong of the *Castaneda* test requires examination of the jury selection system. The mechanics of Missouri's selection of grand jurors, as established by statute, is discussed in detail in *State v. Garrett*, 627 S.W.2d 635 (Mo. banc 1982), and will not be repeated. Appellant concedes that neither this "key man" system,

nor its inherent "opportunity" to discriminate rises to a *per se* constitutional violation. We agree. *Hernandez v. Texas*, 347 U.S. 475, 478–479, 74 S.Ct. 667, 670–671, 98 L.Ed. 866 (1953); *State v. Garrett*, 627 S.W.2d at 638.

The State's evidence proved that no purposeful discrimination was attempted or carried out. Rebuttal evidence may properly include testimony from government officials concerning the methods of and qualifications for selection, but it should be viewed with a "great deal of judicial scrutiny." *Castaneda v. Partida*, 430 U.S. at 498, 97 S.Ct. at 1282. This Court has recently examined testimony similar to that offered in this case and held that it did not prove prejudice or discriminatory intent in selecting grand jurors or grand jury foremen. *State v. Garrett*, 627 S.W.2d at 640. Moreover, *Garrett* made it clear that such selection methods were soundly employed in seeking out the most qualified grand jurors.

Finally, after thoroughly reviewing the entire record, we conclude that appellant has not made a prima facie case for any of his equal protection claims. The indictment to which the motion to quash was directed was "handed down by the grand jury empanelled at the August, 1980 term of court." That jury's composition was 33.3% black when considering only the regulars and 31.5% black when considering both regulars and alternates. Thus, the percentage disparity between the grand jury which indicted appellant and the relevant black population of St. Louis is 5.2% when considering the regulars and 6.25% when considering regulars and alternates. These disparities do not, without proof of a racially biased selection process, make a case for appellant. Cf. *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1965). With respect to the proportion of women on this grand jury, they comprised 58.33% of the jurors. There was no underrepresentation of women; they constituted 56.7% of St. Louis residents eligible for grand jury service. Lastly, the foreman on this grand jury was female and black. We hold the selections challenged in this case constitutionally sound on equal protection grounds.

This Court recently recognized that the "United States Supreme Court has held that a criminal defendant in a state court has a constitutional right to have the grand jury considering his case selected from a fair cross-section of the community." *State v. Garrett*, 627 S.W.2d 635, 637 (Mo. banc 1982). "To prove a fair cross-section violation has occurred, the defendant must show that (1) the group excluded is a 'distinctive' group within the community; (2) the representation of this group is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■ Although juries must be drawn from a source fairly representative of the community, there is "no requirement that . . . juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). "Defendants are not entitled to a jury of any particular composition, (citations omitted) but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

Appellant has not illustrated that systematic exclusion has been carried out for a period of time recognized as sufficient. See, *e.g., Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (involving a time frame of eleven years). The evidence in this case concerning jury pools covers less than a year and a half and involves only three grand jury pools. No evidence was adduced to illustrate a biased selection process for creation of the pools. Moreover, the only statistical showing was that the pools were approximately 23.4% black on the average. No statistics were offered as to the female composition of these pools. Under the facts and circumstances of this case, it must be said that the appellant was indicted by a "fair cross-section" grand jury.

█ *Section 565.014.1, RSMo 1978, mandates that this Court review the sentence of death when it is imposed.* Section 565.014.-3, provides as follows:

"With regard to the sentence, the supreme court shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

"(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

The record in this case demonstrates that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found as an aggravating circumstance that the "capital murder was committed against [a] peace officer ... while engaged in the performance of his official duty." § 565.012.2(8). The evidence supports the jury's finding.

Finally, consideration must be given to whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, taking into account the appellant and the crime. This is the first case in which this Court has reviewed the imposition of the death penalty on the basis of the aggravating circumstance in § 565.-012.2(8). Other cases involving this aggravating circumstance and in which both the death penalty and life imprisonment were submitted to the jury are: *State v. Thomas,* 625 S.W.2d 115 (Mo.1981), and *State v. Davis,* No. 63475 (pending). After examining these cases and giving to each of them the individualized consideration required, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1977), we find that they do not point to excessiveness or disproportionality in the sentence in this case.

The enumerated legal errors have been denied for the reasons stated, and the statement of evidence prepared from the record factually substantiates the verdict. § 565.-014.7.

The judgment is affirmed.

RENDLEN, WELLIVER, MORGAN and HIGGINS, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

Execution set for October 7, 1982.

SEILER, Judge, dissenting.

I respectfully dissent. The defendant is to be executed on the sole ground that the capital murder was committed against a peace officer while engaged in the performance of his official duty, § 565.012.2(8), without the jury at any stage in the trial being required to find that defendant knew or should have known that the victim was a member of the class described.

This is to be the outcome regardless of the fact that the victim was purposely disguised so that people would *not* know he was a police officer on duty. The impression deliberately sought to be made upon others was that the victim was a private citizen. Detective Erson was dressed in street clothes, blue jeans and a baseball jacket. He sat in an unmarked car. His police badge was out of sight in his wallet, which another officer discovered in Erson's back pocket. The miniature police radio, found by the same officer on the car seat, was partially covered by Erson's body. Erson's gun holster was concealed beneath his pants leg. Defendant testified that he did not know the victim or know that he was a police officer. Even in his first taped confession (the second was suppressed because of the beatings), there is nothing to indicate that defendant knew that the victim was a police officer on duty. While the principal opinion pronounces that the evidence "established beyond a reasonable doubt" that defendant knew the victim was a police officer, this was a disputed issue of fact, which was for the jury, not this court, to resolve.

No issue as to the victim being a peace officer on duty or defendant's knowledge thereof was submitted to the jury in the first stage of the trial dealing with guilt or innocence. Capital murder was submitted under the standard MAI–CR2d 15.02, in which, of course, the victim was simply referred to by name, without anything being said as to the victim being an officer or whether defendant was aware that the victim was an officer on duty.

In the second stage of the trial, when it came to deciding whether the punishment would be a life sentence without possibility of parole for 50 years, or death, the jury was instructed only to determine whether the offense was committed against a peace officer while engaged in the performance of his official duty. Nothing was said about knowledge on the part of defendant. That part of instruction No. 19 read as follows:

> In determining the punishment to be assessed against the defendant for the murder of Gregory Erson, you must first unanimously determine:

> .　　.　　.　　.　　.

> 2. Whether the murder of Gregory Erson was committed against a peace officer while engaged in the performance of his official duty. It was the official duty of Gregory Erson to investigate possible incidents of prostitution in an area of the City of St. Louis, in his capacity as an officer of the St. Louis Metropolitan Police Department.

The jury thus was authorized to assess the death penalty on the undisputed fact that the victim was a police officer on duty. The jury should have first been required to find whether defendant had actual knowledge of this undisputed fact. We are not dealing with a malum prohibitum type of offense, such as running a traffic light or selling intoxicating liquor, where no mental element is involved.

Missouri juries have heretofore been required to find such intent under assault statutes. Both under repealed and present assault on officers and obstructing justice statutes (which impose maximum penalties far less severe than execution), the legislature has required that the defendant *know* his victim is a police officer to be found guilty of the aggravated offense. *See, e.g.,* §§ 557.200, 557.210, 557.215 and 557.220, RSMo 1969, V.A.M.S. (repealed 1977); §§ 575.150, 575.160, RSMo 1978. The earlier versions of the statutes used the term "willfully", rather than "knowingly", but the court construed that language to require knowledge as a "necessary element for conviction under § 557.215" in *State v. Copher,* 581 S.W.2d 59 (Mo.App.1979). There the appellate court found reversible error in the state's failure to instruct fully on the element of knowledge. The court found that defendant correctly argued for inclusion of the knowledge element when instructing under § 557.215, since that

> statute makes it a separate and distinct crime to assault a police officer engaged in the performance of his duties.

> What would ordinarily be a . . . misdemeanor . . . becomes a felony if the person willfully assaulted is a police officer engaged in his duties as such.

*Id.* at 61. The court concluded that "knowledge that the person assaulted is a police officer engaged in his duties is a necessary element for conviction under § 557.215." *Id.* See also 18 U.S.C. § 1501; *but see* 18 U.S.C. § 111; *compare United States v. Feola,* 420 U.S. 671 at 686, 95 S.Ct. 1255 at 1264, 43 L.Ed.2d 541 (1975) (noting that knowledge may be a relevant factor under the federal assault statute, 18 U.S.C. § 111; which does not require the defendant to know his victim is an officer); *United States v. Young,* 464 F.2d 160 (5th Cir. 1972) (vacating conviction under § 111 for failure to instruct on defendant's ignorance of the victim's official capacity as a possible defense).[1]

---

1. *See also State v. Green,* 629 S.W.2d 326 (Mo. banc 1982), in which this court reversed convictions under §§ 195.170(1) and 195.250, RSMo 1978, because the trial court failed to instruct the jury on the knowledge element. Although the statute did not specify knowledge as an element, the court held that §§ 562.021.2 and 562.026, RSMo 1978, permitted the court

The principal opinion devotes scant attention to the mens rea aspect of the aggravating circumstance found in this case, dismissing it as "inscrutable" and stating that there was sufficient evidence from which it could be found that defendant knew the victim was a police officer. The latter is beside the point, however, because whether there is sufficient evidence is not the issue: the jury should have been instructed on the question of defendant's knowledge and allowed to make its own factual determination. This was not done.

The implication of the principal opinion (with which I agree) is that knowledge is a necessary element for this particular aggravating circumstance to exist and clearly the legislature intended such. By making the killing of a police officer on duty an aggravated circumstance, for which the death penalty could be assessed, the legislature was striving to protect police officers through the threat of enhanced punishment. Where the perpetrator has no such knowledge, he could not be deterred by the death penalty possibility. The legislature must be taken to have realized that an unknowing assault could not be more reprehensible morally than if the victim had been, as defendant's testimony indicated he believed, a private citizen.

The prosecution's argument at the punishment phase is enlightening on this point. The prosecutor openly acknowledged that the jury had to find the element of knowledge, and erroneously argued that they already had:

> The other aggravating factor [is that] they knew he was a police officer, and obviously, you found that in your initial verdict.... That's why he was killed.

The jury should have been permitted to consider in mitigation that defendant did not know the victim was a police officer. But the jury had no reason to believe this was relevant or material, because all they had to find under the applicable instruction was that the victim was a police officer. This is contrary to what the statute intends.

It does matter in deciding whether a defendant should suffer death for killing a police officer whether he realized or should have realized that was what he was doing. It is self-evident that an unknowing assault on an officer is less reprehensible than a knowing assault.

When an act is made criminal, "the existence of a criminal intent is to be regarded as essential, even when not in terms required." *State v. Hefflin*, 338 Mo. 236, 89 S.W.2d 938, 946 (1936). Before a statute is construed so as to eliminate intent or knowledge as an element of an offense, legislative intent to do so must be clearly apparent. *State v. Gordon*, 536 S.W.2d 811, 817 (Mo.App.1976); *State v. McLarty*, 414 S.W.2d 315, 318 (Mo.1967). The mere absence of the word "knowingly" does not negate the intent requirement; *see Morissette v. United States*, 342 U.S. 246, 261–264, 72 S.Ct. 240, 248–250, 96 L.Ed. 288 (1952).

The notion of mens rea is deeply rooted in American jurisprudence. American criminal law has long joined the guilty act with the guilty mind and has consistently required wrongdoing to be conscious to be criminal. *Morissette v. United States*, at 251–257, 72 S.Ct. at 243–246. Today, this court seeks to sever that tie, and sets a dangerous precedent by interpreting § 565.012.2(8) as not requiring knowledge as an element of an aggravating circumstance. This defendant will likely be executed for the entirely fortuitous circumstance that the victim, who was dressed in civilian clothes and who to all appearances was a private citizen, turned out to be, unknown to defendant, a police officer. For these reasons, I would vote to reverse and remand for a new trial on the punishment issue or would reduce the penalty to life imprisonment without parole for fifty years.

to dispense with the knowledge requirement only if the statute *clearly indicated* legislative

intent to do so, as it did not in that case. *Id.* at 329.