STATE of Missouri, Respondent,

v.

Jerry Allen GODDARD, Appellant.

No. 63476.

Supreme Court of Missouri,
En Banc.

April 26, 1983.
Rehearing Denied May 31, 1983.

R.L. Veit, Carson, Monaco, Coil, Riley & McMillin, P.C., Jefferson City, for appellant.

John Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Jerry Allen Goddard was convicted of first degree murder [§ 565.003, RSMo 1978] and sentenced to life imprisonment. He contends the evidence was insufficient to support the jury's verdict, it was reversible error to instruct on first degree murder because he was charged with capital murder, he was denied a timely arraignment and speedy trial, and the trial court erred in certain evidentiary rulings. We affirm.

Because the evidence relied upon by the state was almost entirely circumstantial, certain established principles govern our review of defendant's challenge to the sufficiency of the evidence. The facts in evidence and all favorable inferences reasonably to be drawn therefrom must be considered in the light most favorable to the verdict and all contrary evidence and inferences must be disregarded. Being a circumstantial evidence case, the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence. However, the circumstances need not be absolutely conclusive of guilt and they need not demonstrate impossibility of innocence—the mere existence of other possible hypothesis is not enough to remove the case from the jury. State v. Franco, 544 S.W.2d 533 (Mo. banc 1976), cert. denied 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).

On October 26, 1980, the body of Ronald Burr was found floating in the Lake of the Ozarks. Ropes had been tied around the arms and legs and an anchor tied to the ankles. The body had been in the water approximately two weeks before it surfaced, and death was attributed to a blow on the head. The events and circumstances which led to defendant being charged with the homicide had their beginning several months earlier.

Defendant and witness Aldridge were co-workers and friends. Aldridge had become acquainted with Burr and Burr had told him of an investment scheme whereby $3,000.00 turned over to Burr would result in the return of $4,500.00 four months later or $6,000.00 would result in a return of $10,000.00 over the same time period. Aldridge told defendant about the plan and defendant was interested. In April defendant, his wife and Aldridge met with Burr at the Columbia restaurant where Burr was employed and the foursome discussed the investment plan. Burr advised the group that June 15 was the next date for investing but defendant and Aldridge decided to wait until the October date. In August defendant told Aldridge he had talked further with Burr and because there was a $6,000.00 limit per person that he was considering putting up the maximum amount for himself, his wife, son and daughter. By doing this and "turning it over" every four months, defendant said he could retire in a few years. Defendant was counting heavily on making substantial money from the scheme, according to Aldridge.

In late September Aldridge learned Burr had disappeared from the Columbia area. He relayed this information to defendant and told him several people were speculating that Burr was a con man and had left town with their money. Defendant was surprised and upset when he heard this but told Aldridge he believed Burr would return to the area because he was to meet with him on October 7 or 8 so he could turn over his money before the October 15 deadline. Although defendant indicated he still expected Burr to keep their appointment, he and Aldridge concluded the investment scheme was illegal and Burr was a crook. Aldridge also told defendant that he understood Burr carried approximately $180,000.00 on his person at times. A day or two later defendant, expressing the view that Burr had ruined his life because the scheme

was not panning out, suggested to Aldridge that if Burr "calls me and sets up an appointment, we could take and rip him off for whatever amount of money he was supposed to have."

Defendant outlined the following plan to Aldridge: "If this guy comes into my house I can go back and get the money and walk in and hand it to him, and while he's sitting down, as he looks down, I have got this gun ... and hit him on the back of the head and rob him." Defendant further explained that in the event things got out of hand and he had to kill Burr then "I have got a boat down at the lake. We can take the guy down to the lake and put him in the car. You can drive the car around to the side of the lake. I can get in my boat and meet you ... and we can put the guy in the boat and take him out and put him in the lake and nobody would ever know." Defendant said Burr's car would be left near the Columbia airport and he would arrange for his children to go to a friend's house or a movie the night of the robbery.

On the night of October 8 defendant, a resident of Jefferson City, telephoned Aldridge twice at the latter's residence in Columbia. He said Burr had been to his apartment and was to return the night of October 10 to pick up defendant's money. Defendant wanted to know if Aldridge was coming down from Columbia to help him as planned. Aldridge told defendant he would talk to him at work. Aldridge did not work October 9 but on October 10 the two men discussed the proposed robbery for about two hours after defendant stated "this is the day." Defendant told Aldridge he already had some ropes at his apartment to use tying Burr. Defendant got mad and became visibly upset when Aldridge told him he had decided not to participate in the criminal venture.

According to Burr's wife he left Pueblo, Colorado, on October 6, driving his 1980 Mustang automobile. He told her he had some business to take care of in Jefferson City. He was registered at the Governor Hotel in Jefferson City on October 7 and 8 and at the Best Western Motel on October 9 with a planned departure date of October 11. He talked with his wife by telephone the nights of October 7 and 9. At about 7 o'clock the night of October 10 he arrived at defendant's apartment. He was not seen thereafter.

In July 1980 defendant purchased a boat and trailer for the sum of $8,500.00. He kept the boat at the Wheelhouse Marina on the Lake of the Ozarks which is located near the four mile marker. Early on a Saturday morning, either October 11 or 18, the dock owner of the Wheelhouse Marina saw defendant and an unidentified man removing defendant's boat from the lake. Defendant advised the dock owner he would be bringing the boat back to the marina the following spring. On October 18 defendant traded the boat and trailer, plus $1,000.00 cash, to a Jefferson City automobile dealer for a used car priced at $6,400.00. At the time of the transaction the boat was "very clean." An anchor that had been on the boat when defendant bought it was missing.

On October 19 a Columbia policeman noticed what turned out to be Burr's automobile parked near a commuter parking area on the outskirts of Columbia. When the vehicle was checked for fingerprints after Burr's body was discovered, the only print found was that of one of the investigating officers who had touched the car in the process of opening a door. The car had been "swept" so that the fingerprint expert was unable to find even smudges of prints either on the interior or exterior of the automobile.

Burr's body came to the surface at about the five mile marker on the lake. The water there is approximately 100 feet deep and one of the deepest parts of the lake. A Water Patrolman had been over the area a short time before the body surfaced and had not seen it. A passerby reported seeing the body and reported the sighting to the Water Patrol and the patrolman went to the scene. He reported the body was visible in the water from a distance of about 300 feet. He secured the body with a rope and towed it to the Wheelhouse Marina.

Ropes, which were later identified as having similar physical microscopic appearances and chemical compositions as ropes found at defendant's boat dock and on his boat, were tied around the victim's arms and legs. An anchor of the same brand, size and shape that had been on the defendant's boat when he purchased it was tied to the rope which bound Burr's legs.

There was no current in the lake where the body was found. The body had been underwater for approximately two weeks and death was due to a hemorrhage of the brain caused by a blow to the right rear portion of the skull. Because of the water temperature at 100 feet, the body was not decomposed and a laceration of the scalp was about the same size and shape as the butt of a pistol. Blood had pooled in the skull which indicated the body had been "folded up in a very unusual position like in a trunk of a car." Fingerprints confirmed the victim was Ronald Burr.

At trial, defendant testified in his own behalf. He admitted he and Aldridge had discussed robbing Burr at gunpoint at his apartment in Jefferson City the night of October 10 when Burr came to pick up defendant's money. He said Burr called him on September 21 at which time he advised Burr he wanted to invest $6,000.00 and they agreed Burr would get the money on October 10. Further, that Burr said he would call him on October 7.

Defendant acknowledged that after he learned of Burr's departure from the Columbia area in September that he had concluded Burr was a con man and a crook. He testified that after he got home on October 8 Burr came to his apartment and he told Burr the money would be ready October 10. He admitted that he called Aldridge in Columbia twice the night of October 8 to inform Aldridge that Burr was back in the area and would be coming to his apartment the night of October 10 to pick up money. Aldridge did not come to work October 9 but the two men talked about the proposed robbery at work on October 10, or, as defendant put it—"the same thing we talked about before, about taking the money away from him."

Defendant admitted that when Aldridge told him he was not going to participate in the proposed crime this news made him mad and "upset me." He said that about 7 o'clock the night of October 10 his wife drove their two children to the movie and Burr arrived at his apartment. According to defendant, Burr left the apartment about an hour later after being advised defendant was not going to invest his money. Defendant denied striking or robbing Burr and said that after the children returned from the movie shortly after 9:30 o'clock he and his wife went out to eat.

Defendant's wife and children also testified in his behalf. The wife said Burr left the apartment about 8 o'clock and that she and defendant were home when the children returned from the movie. The children both testified their parents were home when they came back from the movie. However, shortly after defendant's arrest in early November both children told investigating officers that their parents were not at the apartment when they returned from the movie and one told the officers she stayed up until midnight watching television and her parents were still away when she went to sleep.

Up to a point, the testimony of Aldridge and defendant were entirely consistent with their plan and scheme to rob, and if need be, kill Burr. Any conflicts in their testimony, as well as that of defendant's family, were for the jury to resolve, considering all the facts and circumstances in evidence.

We conclude the jury could reasonably find that defendant carried out his original plan to "rip off" Burr; that, as he had outlined to Aldridge, he lured Burr to his apartment under the guise of investing his money in Burr's scheme. Further, that the six foot six inch defendant, weighing 230 pounds, struck the five foot seven inch, 140 pound, Burr on the right rear portion of the head with the butt of his pistol, with sufficient force to inflict a fatal blow. The jury could also reasonably infer that defendant bound Burr's arms and legs with ropes that he had cut from ropes he had at his dock

and on his boat and transported his victim to the lake area, approximately 50 miles away, in the trunk of an automobile; that pursuant to plan he put the body on board his boat and motored to one of the deepest parts of the lake where he affixed the boat's anchor to the body before dumping it into the lake.

The facts and circumstances, *supra,* are such that the jury could reasonably find and infer that defendant thoroughly cleaned his boat before trading it for a substantially less price than he had paid for it only three months earlier and "swept" Burr's automobile of any fingerprints before leaving it near the area that he had mentioned to Aldridge.

We hold that the facts and circumstances outlined herein are consistent with each other and with the jury's finding of defendant's guilt and exclude every reasonable hypothesis of his innocence. *State v. Franco, supra; State v. Williams,* 515 S.W.2d 544 (Mo.1974); *State v. Paige,* 446 S.W.2d 798 (Mo.1969); *State v. Bayless,* 362 Mo. 109, 240 S.W.2d 114 (Mo.1951).

Defendant contends that because he was charged with capital murder it was reversible error for the trial court to give the jury a first degree murder instruction. In support of this contention he avers that even though the evidence supports the finding that he killed Burr by striking him, in robbing or attempting to rob him, he cannot be convicted of murder in the first degree because he was not charged with that offense, citing *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982).

*Baker* holds that since the amendment to § 565.006.1, RSMo 1978 (effective January 1, 1979), murder in the first degree is not a lesser included offense when capital murder is charged and need not be instructed on unless separately charged even though the evidence would support a finding of guilt of murder in the first degree. Defendant further argues that an instruction on murder in the first degree permitted a conviction of an offense with which he was not charged, contrary to the state and federal constitutions. For reasons which follow, we reject defendant's contention.

The trial judge understandably "instructed down". The instant trial commenced August 31, 1981. Only a short time before, June 11, 1981, this Court handed down *State v. Gardner,* 618 S.W.2d 40 (Mo.1981), in which this same trial judge was reversed because he *did not* instruct on first degree when the charge was capital murder. *Baker* observed that at the time of the killing in *Gardner,* § 565.006.1, RSMo 1978, required that the jury:

> By their verdict ascertain whether the defendant is guilty of capital murder, murder in the first degree, murder in the second degree, manslaughter, or is not guilty of any offense.

The 1979 amended version of § 565.006.1 provides as follows:

> the court shall not give instructions on any lesser included offense which could not be supported by the evidence presented in the case.

The amendment made no change in defining "capital murder" [§ 565.001] or "murder in the first degree" [§ 565.003].

*Baker* also referred to the repeal of § 556.220, RSMo 1969 (effective January 1, 1979) which had provided that the jury could find a defendant guilty of an offense "inferior to that charged in the indictment." This latter statute was the basis for the holding in *State v. Wilkerson,* 616 S.W.2d 829 (Mo. banc 1981), that a jury, in a trial prior to January 1, 1979, could be instructed on murder in the second degree in a case in which the charge was murder in the first degree. From the history just detailed, defendant concludes constitutional, prejudicial and reversible error arises in a conviction of first degree murder when the charge is capital murder. This conclusion requires further historical exploration.

Prior to 1975 the offense of "capital murder" was unknown to Missouri. The elements of that offense were drawn from the former first degree murder statute that included what was termed "conventional" first degree murder and "felony murder". That statute provided as follows:

Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree. [§ 559.010, RSMo 1969 (repealed)]

Under the foregoing statute the felony murder offense could extend to a killing which was not intended at all, or to one not perpetrated by the defendant. Nevertheless, it is interesting to note that the usual form of information or indictment charged the murder to have been done deliberately, premeditatedly, etc., and this was sufficient to charge murder in the first degree, whether the prosecution intended to rely on deliberate murder or felony murder. Kelley's Criminal Law and Practice, § 486 (3rd ed. 1913). This form of submission was sustained countless times as against due process charges, even though it might be argued that it permitted a conviction of a defendant on charges which might not possibly be sustained under a literal reading of the indictment or information, in the context of the evidence in this case. Furthermore, the conventional and approved instruction under this statute was one which required a finding of willful, deliberate and premeditated intent, even though there might be no evidence whatsoever that the defendant intended to kill, or had any part in the actual killing. The possible confusion to the jury was solved by further instruction to the effect that the felony served to prove the homicide. Although this manner and form of charging and instructing may have been artificial, and possibly confusing, it was sustained against numerous challenges.

In 1975 the General Assembly split the two aspects of the then existing first degree murder statute into two classes, capital murder [now § 565.001] and murder in the first degree [now § 565.003] and reenacted them in 1977. The changes were intended to permit the reinstitution of the death penalty in Missouri under the standards enunciated in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and other cases decided concurrently. There is no indication that the Missouri Legislature focused on the problems discussed in Wilkerson, Gardner, Baker, and other cases dealing with similar problems. Nor is there any indication that the legislature had any purpose of disapproving the method of charging or form of submission which would have been proper under the prior law.

This Court did not see any constitutional problem, following the statutory changes, in submitting murder in the first degree in a capital murder case in which it was not charged separately. This follows by implication from Wilkerson and explicitly from Gardner. Defendant's argument that first degree murder is a different offense from capital murder, consisting of different elements, is close akin to the argument found in the dissenting opinion of Bardgett, J., in Wilkerson and which was rejected by a majority of the Court. In *State v. Fuhr,* 626 S.W.2d 379 (Mo.1982), and *State v. Daugherty,* 631 S.W.2d 637 (Mo.1982), both post-1979 cases, the Court ruled first degree murder was properly submissible in a capital murder case. *Fuhr,* citing Wilkerson and Gardner, reversed the conviction because first degree murder was not instructed upon. Daugherty, relying upon Wilkerson and Gardner, held the evidence supported the submission of murder in the first degree. While it is true that both Fuhr and Daugherty appear to be necessarily overruled by Baker, they are of interest in the history of the matter, and in expounding the Court's conclusions on the constitutional implications of charging capital murder and convicting of murder in the first degree.

The repeal of § 556.220 was a part of the adoption of the Criminal Code of 1977, effective January 1, 1979. The Code generally did not apply to homicide cases which the legislature intended to treat separately. The Code did repeal procedural provisions of the existing law, and substituted other provisions which now are applied to homicide cases simply because of the absence of

anything else. We think it is very doubtful that the legislature, in splitting conventional first degree murder into capital murder and first degree murder, turned its attention to the means of submitting homicide cases.

The process of "instructing down" often works to the benefit of the defendant, in giving the jury the opportunity to mitigate the guilt and punishment where there is substantial evidence to find the defendant guilty. There would be a strange twist in the criminal law if a defendant who had the benefit of the jury's mercy could then use the resultant conviction as a basis for avoiding conviction on the higher offense charged, on the less serious offense of which he was convicted,. and possibly, of any offense whatsoever.[1] Such a result should be countenanced only if compelled by express statutory provisions or by constitutional imperatives.

■ We are of the opinion that the form of submission was not prejudicial to the instant defendant in the context of this case and it did not deprive him of constitutional rights. The State's case depended on the jury's accepting evidence demonstrating a chain of circumstances in which the defendant declared a purpose of robbing and killing Burr, whom he considered to be a confidence man with large quantities of cash.

Here, the absence of prejudice to the defendant comes, not from the strength of the case against him, but from the circumstance that the evidence which supported the instruction on first degree murder *is exactly the same evidence which would have supported a conviction of capital murder.* There is no evidence that defendant acted other than alone. If he acted at all, he acted in the commission or attempted

commission of a robbery, planned in advance and therefore premeditated. If the defendant killed Burr, he killed him willfully, deliberately, and with premeditation. A clear issue was made for the jury in the evidence, the arguments, and the instructions. Based on the facts as the jury saw them, the conviction of murder in the first degree was a mitigation of the offense charged, and not a conviction of something other than what was charged. Under these circumstances, we do not believe that we are required to reverse defendant's conviction because of a form of submission which had been approved in Missouri for many years and which, at time of trial, was the law.

■ We agree that the defendant, as a matter of due process, is entitled to notice of the charges against him and may not be convicted of any offense for which the information or indictment does not give him fair notice. For the reasons assigned above, however, the problem before us is not one of due process but rather of procedure.

■ This Court holds *Baker* is not retroactive, but prospective, in its application and the trial court did not commit reversible error in submitting first degree murder. Defendant was on clear notice at the time of the homicide and his. trial that he could be convicted of first degree murder even though he was formally charged with capital murder.[2]

Defendant contends that he was denied the right to a speedy trial pursuant to the Sixth Amendment of the U.S. Constitution and under the Missouri statutory provision § 545.780, RSMo 1978.

---

1. An examination of the homicide cases in recent years will quickly reveal that the defendants generally take one of two positions: (1) The court erred in failing to instruct down; (2) The court erred because it instructed down. Admittedly, the changes in statutes, the decisions of this Court, and the MAI instructions (including notes on use), have all contributed to the problems confronting trial judges in instructing juries in homicide cases.

2. On the question of prospective vs. retroactive applications of decisions, see: *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); *Wainright v. Stone,* 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); and *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

■ The record indicates that defendant was arrested on November 12, 1980 and tried on August 31, 1981; a total of nine and one-half months. According to the U.S. Supreme Court, "it is ... impossible to determine with precision when the right has been denied." *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). According to the Barker Court, a delay which was "presumptively prejudicial" to the accused would trigger a balancing process. If there was no "presumptively prejudicial" delay, then further inquiry was not required. *Id.* at 530, 92 S.Ct. at 2192. Here, there was no prejudice specifically alleged, nor was the time such that it could be presumed. Therefore, further inquiry is not required on the constitutional provision.

■ Defendant also contends that his rights under the Missouri speedy trial provisions were violated. The statute, § 545.780, RSMo 1978, provides for arraignment within ten days of arrest and trial within 180 days of arraignment. Sections (1) and (2). Arraignment was held on December 30, 1980, and the trial took place on August 31, 1981, two months beyond the statutory limit. The record, however, shows that defendant was responsible for a substantial portion of the delay due to his numerous pre-trial motions, and changes of venue. According to § 545.780(3)(1)(c, d), these periods are to be excluded when computing the time. "While defendant has a legal right to assert such matters, he is in no position to complain of the delay occasioned by the conscientious processing and deciding of such motions by the trial court." *State v. Dean,* 637 S.W.2d 409, at 411 (Mo. App.1982).

The foregoing analysis should be considered in light of § 545.780(5), RSMo 1978 which provides that if there is a late arraignment or trial, the judge *"may"* dismiss, with or without prejudice. Considering the seriousness of the offense and the impact of reprosecution on the administration of justice, there was no abuse of discretion in the trial court's refusal to dismiss the charge.

We have reviewed defendant's remaining assignments, directed to evidentiary rulings by the trial court. We find no error calling for reversal.

The judgment is affirmed.

RENDLEN, C.J., and HIGGINS and GUNN, JJ., concur.

WELLIVER, J., dissents in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

SEILER, Senior Judge, dissents and concurs in separate dissenting opinions of WELLIVER and DONNELLY, JJ.

BLACKMAR, J., not participating because not a member of the Court when cause was submitted.

WELLIVER, Judge, dissenting.

I respectfully dissent. The principal opinion demonstrates the classic catch-22 into which the majority has written the Court in an effort to affirm criminal convictions.

For a long period of time, instructing down on homicides has been one of the most confused areas of the criminal law. It has been one of the most perplexing problems facing our criminal instructions committee, which only last month met with the Court in an effort to find a solution to the problem.

Four recent cases in which defendants were charged with capital murder have put the ball in our "court." Those are *State v. Baker,* 636 S.W.2d 902 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); *State v. Daugherty,* 631 S.W.2d 637 (Mo.1982), now pending in this Court on a motion to recall the mandate under the authority of *Baker; State v. Holland,* No. 62320 (Mo. banc argued Sept. 27, 1982); and this case. In *Baker* defendant was not given an instruction down on first degree felony murder. In each of the other three cases an instruction down on first degree felony murder was given. All four murders were committed after § 556.-

046, RSMo 1978, became effective. The murders in *Daugherty, Holland,* and this case, and the trials thereon, all occurred prior to our decision in *Baker. Daugherty* and *Holland* are companion cases.

*Baker* was the first case involving instruction on lesser included offenses under a capital murder charge to recognize the existence of § 556.046. In *Baker* we held that defendant was not entitled to an instruction down on first degree felony murder because under the language of § 556.-046 that crime is not a lesser included offense of capital murder. 636 S.W.2d at 904–05. We pointed out that our prior cases holding that first degree felony murder was a lesser included offense of capital murder under § 556.046 were based on cases that interpreted a previous, and different, lesser included offenses statute. *See Daugherty,* 631 S.W.2d at 645 (relying on *State v. Gardner,* 618 S.W.2d 40 (Mo. 1981)); *State v. Fuhr,* 626 S.W.2d 379, 379 (Mo.1982) (same).

Appellant herein contends that on the authority of *Baker* it was error to convict him of first degree felony murder because he was not charged with that offense. The principal opinion seeks to avoid *Baker* by holding that it is to be applied prospectively, thereby making affirmances possible in all of these cases. *Baker,* however, cannot be applied only prospectively. *Baker* merely applied the plain language of § 556.046, as written, to the Missouri homicide scheme. It made no attempt to construe that statute, which is part of the criminal code, in light of its intended relationship to the homicide statutes, which are not part of the criminal code. A statute applied as written must be applied only from the date it becomes effective. Either *Baker* is viable or it is not viable. To say that *Baker* is to be applied prospectively is to say that § 556.-046 is to be ignored between January 1, 1979, the date it was effective, and August 23, 1982, the date *Baker* was decided.

If *Baker* is viable, then the principal opinion works a flagrant deprivation of due process, for it allows appellant to be imprisoned for life on a conviction for a crime with which he was never charged. In Missouri there are but two ways in which a defendant can be charged with a criminal offense: either (1) expressly by the language of the indictment or information or (2) impliedly because the offense is a lesser included offense of that which is expressly charged. *See State v. Wilkerson,* 616 S.W.2d 829, 832 (Mo. banc 1981). *See also State v. Stone,* 571 S.W.2d 486, 487 (Mo. App.1978). This principle has been firmly entrenched in our system of criminal law for more than 140 years. *See State v. Shoemaker,* 7 Mo. 177, 180 (1841). In view of this fact there is no question that if *Baker* is viable, appellant was not charged with first degree felony murder. The express language of the indictment charged appellant with capital murder, not first degree felony murder, and *Baker* held that first degree felony murder is not a lesser included offense of capital murder. If *Baker* stands, appellant could not properly be convicted of first degree felony murder. It is fundamental that a defendant cannot be convicted of a crime with which he is not charged. *Wilkerson,* 616 S.W.2d at 833; *State v. Smith,* 592 S.W.2d 165, 165 (Mo. banc 1979); *State v. Billingsley,* 465 S.W.2d 569, 570 (Mo.1971). Indeed, "[c]onviction upon a charge not made would be a sheer denial of due process." *De Jonge v. Oregon,* 299 U.S. 353, 362, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937). That is so because the trial court lacks subject matter jurisdiction to render a conviction for a crime that is not charged. *State v. Gladies,* 456 S.W.2d 23, 25 (Mo.1970); *Montgomery v. State,* 454 S.W.2d 571, 574–75 (Mo.1970).

The principal opinion does not deny that this jurisdictional defect exists. Instead, it treats the problem as one of harmless error, arguing that appellant was not prejudiced because "the evidence which supported the instruction on first degree murder *is exactly the same evidence which would have supported a conviction of capital murder.*" That argument falls on its own premise. In this case the same evidence that would have supported a conviction for capital murder would also have supported a conviction for robbery or attempted robbery. The princi-

pal opinion concedes that if appellant "acted at all, he acted in the commission or attempted commission of a robbery." It is wholly foreign to our concept of criminal jurisprudence to suggest that a defendant could be convicted of robbery or attempted robbery under a charge of capital murder simply because one of those offenses happened to be proven concomitantly with the attempt to prove capital murder. The jurisdictional defect cannot possibly be harmless error, for in the absence of jurisdiction the conviction itself is the prejudice.

The principal opinion would appear to construe, rather than apply, § 556.046 based upon the historical development of Missouri homicide law and the enactment of the criminal code. It makes a strong case that the legislature did not intend for the words "specifically denominated by statute as a lesser degree of the offense charged" to change prior practice relating to instruction down on lesser included offenses. The drafters' comment to that section indicates as much. See Mo.Ann.Stat. § 556.046 comment (Vernon 1979). The principal opinion stops short of resting its holding on that construction of the statute, however, and instead interjects the notion of prospective application of Baker. I could subscribe to a construction of the statute such as that which the principal opinion postulates if the Court would overrule Baker forthrightly.[1] It is inconsistent to avoid Baker in this case and still retain Baker as viable in order to leave the conviction and death sentence in that case intact. I cannot be a party to such inconsistency.

The appearance of conservatism in the area of criminal law has become a shibboleth for many courts in view of the public demand today for law and order. We should not allow ourselves to be blinded to that fact. Nearly eighty years ago Mr. Justice Holmes warned that

> [g]reat cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in

shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

*Northern Securities Co. v. United States,* 193 U.S. 197, 400–01, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (Holmes, J., dissenting). We are bound to decide cases in accordance with principles of justice and not on the basis of our own perception of guilt or innocence. We are faced with a situation in which we must either apply *Baker* and grant Goddard, Holland, and Daugherty new trials or overrule *Baker* and grant Baker a new trial. To strain law and logic in order to reach the principal opinion's result is to work a deprivation of individual liberty that true conservatism could not, and should not, condone.

DONNELLY, Judge, dissenting.

It is settled in Missouri that a court is without jurisdiction to enter a judgment of conviction against an accused as to an offense with which he has not been charged. *Montgomery v. State,* 454 S.W.2d 571 (Mo. 1970). "Conviction upon a charge not made would be sheer denial of due process." *De Jonge v. Oregon,* 299 U.S. 353, 362, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937).

Appellant Goddard was charged with capital murder. He was not charged with first degree murder. He was convicted of first degree murder. In my view, this judgment of conviction cannot stand.

Section 556.046, RSMo 1978, provides that a "defendant may be convicted of an offense included in an offense charged in the indictment or information." However, in *State v. Baker,* 636 S.W.2d 902, 904 (Mo. banc 1982), this Court was compelled by § 556.046, *supra,* to recognize that "first degree murder is not a lesser included offense of capital murder."

---

1. If we were to overrule *Baker,* we would also be obliged to recall the mandate in that case

and remand the case for a new trial.

The majority "holds *Baker* is not retroactive, but prospective, in its application and the trial court did not commit reversible error in submitting first degree murder." The majority gives undeserved stature to the opinion in *Baker*. The Criminal Code, not the opinion in *Baker*, mandated the *Baker* result. Section 556.031, RSMo 1978, states that the provisions of the code "shall govern the construction and punishment for any offense defined in this code and committed after January 1, 1979 * * *." The crime in this case was committed October 26, 1980. Therefore, § 556.046, *supra*, of The Criminal Code applies here and requires that the judgment be reversed and the cause remanded for new trial.

I respectfully dissent.