STATE of Missouri, Respondent,

v.

James CHUNN, Appellant.

No. 14079.

Missouri Court of Appeals,
Southern District,
Division Three.

Nov. 18, 1985.
Application to Transfer Denied
Feb. 18, 1986.

Kenny C. Hulshof, Asst. Public Defender, Jackson, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

James Chunn ("defendant"), tried as a persistent offender, § 558.016.3, RSMo Cum.Supp.1983, was found guilty by a jury of the class C felonies of burglary in the second degree, § 569.170, RSMo 1978, and stealing property of the value of at least $150, § 570.030, RSMo Cum.Supp.1983. The trial court sentenced defendant to 15 years' imprisonment for each offense, ordering the sentences to run concurrently.

Defendant challenges the sufficiency of the evidence to support the verdicts, and he charges the trial court with error in failing to grant a mistrial when the jury submitted a written inquiry to the court while the jury was examining the State's exhibits during a recess prior to the presentation of defendant's evidence.

In determining whether there was sufficient evidence to support the verdicts, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences to be drawn from the evidence, and we ignore contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* — U.S. —, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald,* 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied,* — U.S. —, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, is such that a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi,* 636 S.W.2d 338, 340[1] (Mo. banc 1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979). Inasmuch as this is a circumstantial evidence case, the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence. *State v. Goddard,* 649 S.W.2d 882, 884[2] (Mo. banc 1983). However, the circumstances need not be absolutely conclusive of guilt, nor must they demonstrate impossibility of innocence—the mere existence of other possible hypotheses is not enough to remove the case from the jury. *Id.*

Viewed in accordance with those precepts, the evidence establishes that on Sunday, June 5, 1983, Audra Leek, a widow, left her home, 1812 East Parkview, Caruthersville, where she resided alone, to go on a vacation. During Mrs. Leek's absence, her daughter, Shirley Powell, went by Mrs. Leek's home at intervals to pick up the mail and check the condition of the house. Mrs. Powell made such a visit on Wednesday, June 8, finding everything in order.

Mrs. Powell returned to her mother's home Friday, June 10, shortly after 5:00 p.m., and discovered that "the back door underneath the carport" had been broken open. Mrs. Powell entered and observed that the house had been ransacked and that her mother's jewelry boxes were missing. Mrs. Powell notified the Caruthersville police.

The next day, June 11, Mrs. Powell received a phone call from her daughter-in-law, who had heard a news broadcast that

morning about the burglary. The daughter-in-law informed Mrs. Powell that she had seen a diamond necklace in the possession of Gary Hatley, a young man employed at a Caruthersville pool hall operated by the daughter-in-law's parents.

Mrs. Powell, accompanied by her husband, went to the pool hall, confronted Hatley, and asked to see the necklace. Hatley stated it was at his house, but that he would get it.

Hatley departed, returned with the necklace, and showed it to Mrs. Powell and her husband. They identified it as the property of Mrs. Leek and informed Hatley that Mrs. Leek's home had been burglarized.

Mrs. Powell then asked Hatley where he had gotten the necklace, and he replied, "[F]rom a guy."

Mrs. Powell warned Hatley that if she did not get the remainder of her mother's property back, she would inform the police that Hatley had the necklace. Hatley said he would see what he could do.

He then made some phone calls, after which he asked Mrs. Powell if she would pay $10 for the return of her mother's property. Mrs. Powell agreed and Hatley was handed $10. He then departed, returning some 20 minutes later with a pillowcase containing some jewelry. Mrs. Powell identified the pillowcase and the jewelry as her mother's, but noted that the pillowcase did not contain all of the missing items. Mrs. Powell and her husband then took Hatley, the necklace, the pillowcase, and its contents to police headquarters.

At trial, Hatley, testifying as a State's witness, revealed that he had known defendant about 8 years, and that on Friday evening, June 10, 1983, he (Hatley) and defendant were drinking beer in the backyard of the home of defendant's mother. Hatley recalled defendant saying, "I've gotta go get somethin'," or, "I'm goin' to get somethin'," or words to that effect.

Then, according to Hatley, defendant "went up the alley." Defendant reappeared a few minutes later, carrying a pillowcase. Hatley watched as defendant re-moved "assorted necklaces, a watch, just assorted jewelry" from the pillowcase.

Hatley testified he asked defendant for one of the items, a diamond necklace, and that defendant gave it to him. As defendant did so, Hatley recalled defendant saying, "If you get caught with it, it's your ass." Hatley "figured" the necklace was stolen.

The next day, Hatley was "showing off" the necklace at the pool hall, saying he had bought it in Caruthersville for his girl friend. This necklace was the one Hatley showed Mrs. Powell and her husband when they confronted him.

Hatley testified that defendant was the person he phoned in response to the Powells' demand for the return of the remainder of Mrs. Leek's jewelry.

Describing those calls, Hatley stated that defendant "hung up on me the first time." Hatley phoned again, and defendant terminated the call saying, "Man, I think you're tryin' to mess me around."

Hatley phoned a third time, explaining to defendant: "Well, I'm fixin' to go to jail," you know, "I need the stuff back," you know, "to keep me out of trouble."

Defendant's reply, according to Hatley, was: "What's it worth to you?"

Hatley answered that it was worth a lot because he would be jailed if the items were not recovered.

According to Hatley, defendant said, "Bring me $10.00 and I'll give it back to you."

Hatley then obtained the $10 from the Powells, drove to the home of defendant's mother, entered, and was given the pillowcase containing the jewelry by defendant. Hatley handed defendant the $10 and returned to the pool hall, surrendering the pillowcase and its contents to the Powells.

After accompanying the Powells to the police station, Hatley gave the police a statement implicating defendant.

Lisa Dale Roberts, a teenager who resided with her parents at 1808 East Parkview, Caruthersville, in June of 1983, testified

that their home was next door to Mrs. Leek's. Lisa, who was acquainted with defendant, testified that he, at that time, resided at the home of his mother, half a block from Mrs. Leek's home.

Lisa recalled that in June, 1983, after the burglary of Mrs. Leek's home, defendant gave her a "turquoise and silver bracelet," from which one of the stones was missing. Defendant did not tell Lisa where he had gotten the bracelet, nor did he caution her not to wear it when she went to Mrs. Leek's home. Lisa, who had learned from her father about the burglary of Mrs. Leek's home, gave the bracelet to her father, who turned it over to the police. Lisa identified the bracelet at defendant's trial.

Lieutenant Marvin Dye of the Caruthersville police department was at headquarters on June 11, 1983, when the Powells arrived with Hatley and the jewelry. Photographs were taken of the jewelry, and an investigation was commenced regarding the burglary. As a result of the investigation, the police began looking for defendant.

On September 13, 1983, the police received a "tip" that defendant was in Caruthersville at 603 Eastwood, "the Hatley residence." Lieutenant Dye, Officer Harvey Moore, Jr., and an Officer Mansfield went there for the purpose of arresting defendant.

Lieutenant Dye and Officer Mansfield entered, finding several people inside, including defendant's sister, Linda Hatley, and her husband, Ronnie Hatley. Lieutenant Dye requested permission to look in the bathroom, but his request was denied.

About that time, Officer Moore, positioned at the rear of the house, saw defendant come out a back window. Officer Moore ordered defendant to halt, but defendant began running. Officer Moore pursued defendant on foot and, during the pursuit, fired a shot in the air. Defendant, however, continued running. After a chase of some four blocks, Officer Moore overtook defendant and subdued him.

Gary Hatley testified that one night after defendant was arrested, he (Hatley) was walking past the county jail and defendant "hollered" at him. Hatley testified, "I don't recall his exact words, but it was somethin' like, 'You snitch, you better not show up in court,' or somethin' like that."

On Friday, October 26, 1984, six days before trial,[1] Linda Hatley, defendant's sister, received a letter addressed to her husband, Ronnie. The letter, written by defendant, was dated "10–23–84" and had been sent to the home of Linda's mother in Caruthersville. The letter is set out marginally.[2]

At trial, Mrs. Leek identified as her property the diamond necklace recovered from Gary Hatley on June 11, 1983, by Shirley Powell and Shirley's husband. Mrs. Leek also identified the pillowcase and the jewelry Gary Hatley turned over to the Powells

---

1. The cause was tried in New Madrid County on change of venue from Pemiscot County.

2. "Ronnie
Hey Brother-in-law. I'm sure you got my other letters. The chick that's doing the investagation [sic] stoped [sic] by and talked with me today. She said she had been to Caruthersville and talked with you and Linda. And you both told her you didn't know why I was subpoenaing the two of you. Well if you been geting [sic] my letters you know why. You know I want you and Linda to say I was living with you in Tenn. All you have to say is I went back to Tenn to live with you on the weekend of June 4th Sat 5 Sun. And that I was their [sic] from the 5th to the 10th and we came over to C'ville the 10th friday. And no one can prove any differnt [sic]. If you say I

was living with you and Linda says the same and I say the same. And that's what I'm going to say. I was liveing [sic] in Tenn with you and Linda. I'm going to tell you one thang [sic]. And it's the last time I'm going to tell you. If I get convicted on the buglary [sic] and stealing charges their [sic] is going to be some people wish the hell I had never had your brother write a f____g statement on me. And your brother aint the only one either you and Skinny Ray is going to wish you didnt ever know me. When I get finished telling all I know in New Madrid Court house. So you and Linda say what you want to say. Don't call my bluff. I aint Bluffing See you on the 1st.
                                        James
P.S. I got *Nothing* to lose"

on June 11. Upon being shown the bracelet given by defendant to Lisa Dale Roberts, Mrs. Leek identified it as hers, but conceded she did not know whether the stone had been missing from the bracelet at the time she left on vacation. Mrs. Leek testified that the aggregate value of all items taken from her home was about $2,000.

Defendant testified that in June, 1983, he was residing in Ripley, Tennessee, with his sister, Linda Hatley, and her husband, Ronnie. Defendant stated that after Ronnie finished work on Friday, June 10, 1983, the three of them drove from Ripley to Caruthersville to spend the weekend visiting relatives.

Defendant recalled drinking beer in the backyard of his mother's home that night in the company of his brother Danny Chunn, Gary Hatley, and Ronnie Hatley. According to defendant, Ronnie went inside to bed and Danny departed for an undisclosed destination, leaving defendant and Gary Hatley in the backyard.

Then, said defendant, he went inside to phone his ex-wife about visiting her residence to see their children. Defendant explained that after the call, he returned to the backyard and saw Gary Hatley "settin' out there in the chair with this pillowcase full of jewelry."

Defendant recounted that he expressed no interest in the jewelry, and that he departed a few minutes later for the residence of his ex-wife.

Defendant recalled the phone calls from Gary Hatley the next afternoon, but disavowed any discussion of a $10 payment for return of the jewelry. Defendant did, however, admit seeing Gary Hatley at defendant's mother's house that day. According to defendant, Hatley arrived in an automobile about 20 minutes after the third call, got out, went to a doghouse, and removed the pillowcase of jewelry. Defendant testified he warned Hatley that he (defendant) would call the police if Hatley hid anything else around defendant's mother's house.

Later that afternoon, according to defendant, he was picking up the beer cans from the night before, when he found a bracelet where Gary Hatley had been seated. Defendant explained that his sisters disclaimed ownership of the bracelet and, two weekends later, he gave it to Lisa Dale Roberts.

Defendant admitted fleeing from the police on September 13, 1983, but said he did so "because I knew the police were lookin' for me for a parole warrant." Defendant explained he had been in a "half-way house" and had been told that if he did not come back, "they was gonna put a parole warrant on me."

Defendant's brother, Danny Chunn, called as a witness by defendant, surprisingly testified that defendant was living with his mother on June 10, 1983, and had "been there a while." This, of course, contradicted defendant's testimony that he was residing with Linda and Ronnie Hatley in Ripley, Tennessee, on June 10.

Defense counsel, in his opening statement at trial, conceded that Mrs. Leek's home was burglarized, and announced that the sole issue was whether defendant was the culprit. Consequently, our task is to determine whether the evidence is sufficient to support a finding adverse to defendant on that issue.

■ An inference of guilt is permissible from the unexplained possession of property recently stolen in a burglary, and the inference exists as to both the burglary and the stealing. *State v. Arnold*, 566 S.W.2d 185, 188[4] (Mo. banc 1978); *State v. Cobb*, 444 S.W.2d 408, 414[9] (Mo. banc 1969). Such evidence is sufficient to support a submission of both the burglary and the stealing to the jury. *State v. Miller*, 499 S.W.2d 496, 499[4] (Mo.1973).

As to how "recent" the burglary and theft must have been in order to permit the inference, we note that in *State v. Lewis*, 482 S.W.2d 436 (Mo.1972), the victim left his home on July 14, 1970, and the accused had possession of items stolen from the victim's home when the accused was ap-

prehended on the evening of July 15, 1970. It was held that the jury could properly infer the accused's guilt from that evidence.

In the instant case, the jewelry and pillowcase were in Mrs. Leek's home when Shirley Powell was there on June 8, 1983, and the jewelry and pillowcase were seen in defendant's possession by Gary Hatley on June 10, 1983, within one block of Mrs. Leek's home.

An interval greater in time and distance than the one in the instant case existed in *State v. Robb*, 439 S.W.2d 510 (Mo.1969). There, some 125 radiators were stolen in a burglary of an auto salvage business sometime during the night of March 10–11, 1967. On March 15, 1967, the accused arranged to sell some radiators to one Snider. The accused then procured one Lee to rent a truck and deliver certain radiators from a rural location, where they had been hidden, to a barn on a farm owned by Snider's father. The radiators were ultimately recovered from the barn on March 22, 1967, and identified by the burglary victim. This evidence was held sufficient to support a submission of burglary and stealing to the jury.

In the instant case, the principal thrust of defendant's assault on the evidence, as we comprehend it, is that the only proof that he had possession of Mrs. Leek's necklace and the pillowcase containing other pieces of her jewelry on the evening of June 10, 1983, was the testimony of Gary Hatley. That testimony, insists defendant, was "so ridiculously incredible that it should be disregarded."

Defendant maintains that Hatley faced the prospect of incarceration if the blame were not shifted to another, that Hatley had consumed several beers on June 10, that Hatley initially lied in saying he had purchased the diamond necklace in Caruthersville, and that Hatley's testimony that he received $2,000 worth of jewelry from defendant for $10 is incredible.

■ Defendant's argument is obviously nothing more than an invitation to us to make our own assessment of the credibility of Hatley's testimony. That is not our role. *State v. Small*, 423 S.W.2d 750, 751[2] (Mo.1968); *State v. Williams*, 376 S.W.2d 133, 136[11] (Mo.1964). The credibility of Hatley and the weight and value to be given his testimony were matters within the province of the jury, and are not for review on appeal. *State v. Wright*, 476 S.W.2d 581, 584[4] (Mo.1972). The testimony of a single witness, if believed by the jury beyond a reasonable doubt, is sufficient to establish the identity of the accused in a criminal prosecution. *State v. Tucker*, 451 S.W.2d 91, 95[5] (Mo.1970); *Williams*, 376 S.W.2d at 136[9].

Moreover, Hatley's testimony was not the only evidence linking defendant with the burglary and theft. Lisa Dale Roberts identified the turquoise and silver bracelet, and testified that defendant had given it to her sometime after the burglary. Defendant, by his own admission, had possession of that bracelet from June 11, 1983, until he gave it to Lisa. Mrs. Leek identified the bracelet as hers at trial. Mrs. Leek's admission that she did not remember whether the stone was missing from the bracelet when she left on vacation was a circumstance for the jury—not us—to consider in evaluating Mrs. Leek's identification of the bracelet. As noted above, we do not determine the believability of a witness' testimony.

■ Defendant's testimony that he had found the bracelet in the backyard of his mother's home on June 11, 1983, did not preclude the jury from inferring that defendant had stolen it from Mrs. Leek's residence. The requirement that an accused's possession of recently stolen goods be "unexplained" in order to support an inference that he stole them means simply that if the accused tenders an explanation for the possession, the credibility of his explanation is a question for the jury. *State v. Pickett*, 642 S.W.2d 703, 705[2] (Mo.App.1982). If an accused's explanation of his possession of recently stolen property is disbelieved by the jury—as defendant's explanation about the bracelet appar-

ently was in the instant case—his possession stands as if unexplained. *State v. Clark*, 438 S.W.2d 277, 279[3] (Mo.1969); *State v. Coleman*, 524 S.W.2d 27, 29[3] (Mo.App.1975).

Furthermore, it must be remembered that defendant denied ever having possession of the diamond necklace and the pillowcase containing other items of jewelry stolen from Mrs. Leek's residence. Consequently, Gary Hatley's testimony that defendant appeared in the backyard of defendant's mother's home on the night of June 10, 1983, carrying those items, was unexplained by defendant.

■ It must also be noted that the evidence of defendant's possession of the recently stolen items was not the only evidence of his guilt. Defendant fled the Hatley residence when the police entered on September 13, 1983, to arrest him. Defendant's flight was admissible to show a consciousness of guilt on his part. *State v. Kilgore*, 447 S.W.2d 544, 547[4] (Mo.1969); *State v. Logan*, 617 S.W.2d 433, 435[3] (Mo.App.1981). Its weight was for the jury. *State v. Ball*, 339 S.W.2d 783, 784–85[2] (Mo. banc 1960); *Logan*, 617 S.W.2d at 435[3].

In pointing this out, we do not ignore defendant's explanation that he ran because he thought the officers had a "parole warrant" for him. If defendant indeed harbored that fear, it was apparently groundless, as Lieutenant Dye denied having any such warrant. Officer Moore, while under the impression that there was a warrant of some kind for defendant's arrest, had no warrant himself, nor did he furnish any details about any warrant.

Whether defendant fled because of consciousness of guilt regarding the burglary of Mrs. Leek's home, or because he believed the officers had a "parole warrant," was for the jury to resolve. *Logan*, 617 S.W.2d at 435.

In addition to defendant's flight, there was Gary Hatley's testimony that defendant had shouted at Hatley from the jail, attempting to dissuade Hatley from testifying. There was also the letter defendant wrote to Ronnie Hatley, which could reasonably be construed as an attempt, by threat, to compel Ronnie to corroborate defendant's alibi that he was in Ripley, Tennessee, when the burglary and theft occurred.

■ Evidence of threats by an accused toward a witness against him may be adduced in order to establish his guilt on the original charge. *State v. Corlew*, 463 S.W.2d 836, 839–40[5] (Mo.1971); *State v. Mason*, 394 S.W.2d 343, 344[2] (Mo.1965). Such evidence is admissible as showing a consciousness of guilt. *Mason*, 394 S.W.2d at 344; *State v. Berry*, 526 S.W.2d 92, 100–01 (Mo.App.1975). Evidence that an accused attempted to procure false evidence is likewise admissible as showing consciousness of guilt. *State v. Stapleton*, 518 S.W.2d 292, 297 (Mo. banc 1975); *State v. Smith*, 355 Mo. 59, 64, 194 S.W.2d 905, 907[6] (1946).

■ In sum, our evaluation of the record is that the evidence that defendant had possession of items recently stolen from Mrs. Leek's residence would, by itself, have been sufficient to support the verdicts of guilty. *Arnold*, 566 S.W.2d at 188[4]; *Cobb*, 444 S.W.2d at 414[9]. When defendant's flight from the police on September 13, 1983, his verbal threat to Gary Hatley, and his letter to Ronnie Hatley are added to the evidence of possession of the recently stolen items, it is manifest that defendant's challenge of the sufficiency of the evidence is without merit. The point is, accordingly, denied.

We now turn to the incident which, according to defendant, should have resulted in a mistrial.

When the State rested, defense counsel said: "Your Honor, I've got some matters we need to take up out of the hearing of the jury, maybe we can possibly pass the exhibits to them during a brief recess. I'd like to ask for a recess from the Court, if I could."

At that time, the exhibits that had been received in evidence were the necklace that

Shirley Powell and her husband had recovered from Gary Hatley, the bracelet that defendant had given Lisa Dale Roberts, the pillowcase and jewelry delivered to Shirley Powell and her husband by Gary Hatley, an inventory listing the stolen items that were returned to Mrs. Leek by the Caruthersville police, an inventory prepared by Mrs. Leek listing the stolen items that were never recovered, and a photograph taken on June 11, 1983, of the jewelry that Shirley Powell had brought to police headquarters when she and her husband had escorted Gary Hatley there.

Earlier, when the prosecuting attorney had completed his direct examination of Mrs. Leek, he had requested permission to pass certain exhibits to the jury, but defense counsel had objected, stating he preferred to conduct his cross-examination of Mrs. Leek without the jury simultaneously looking at the exhibits. The trial court had sustained the objection. As a consequence, none of the exhibits had been examined by the jury at the time the State rested.

When defense counsel suggested that the jury examine the exhibits during a recess, the prosecuting attorney suggested that the jury and the exhibits be taken to the jury room. The trial court thereupon instructed the bailiff to do so, and the jurors were taken to the jury room at 2:10 p.m., along with the exhibits listed above.

Defense counsel then took up certain matters with the trial court, none of which are pertinent to the point under consideration. The trial court completed its disposition of those matters at 2:17 p.m., and instructed the bailiff to see whether the jurors desired to go to the rest room when they finished looking at the exhibits.

At 2:28 p.m., there was a power failure, and no electricity was available in the courthouse.

At 2:34 p.m., the bailiff advised the trial court that the jurors had a question they desired to ask. The trial court asked counsel for both sides whether the jury should be allowed to submit the question in writing. Counsel for both sides consented.

Shortly thereafter, the bailiff handed the trial court a handwritten note stating:

"There are 2 items missing that are in the picture:

1. What is in the green & yellow box
2. The round pin on the lower left hand side that is".

Although neither the note nor the picture has been furnished us, the transcript reveals that immediately following clause number "2" of the note there appeared a diagram of some sort showing a picture or figure.

Defense counsel immediately protested that the jury had obviously been discussing the exhibits, and that such was improper in that the cause had not yet been given to them for deliberation. Defense counsel moved for a mistrial.

The trial court denied the motion.

Thereafter, while the power outage continued, lanterns were placed in the courtroom, and proceedings were resumed at 3:35 p.m. The trial court told the jury: "Now, the law prohibits me from answering the question that was sent by one of the jurors."

Defendant then presented his evidence and the trial proceeded to conclusion.

In his assignment of error regarding this incident, defendant maintains he should be awarded a new trial because, in his words: "(1) The trial court erred by failing to admonish the jury not to discuss the case prior to its submission to them; (2) The jury committed misconduct by prematurely deliberating the case; (3) The trial court erred by failing to grant a mistrial or any other relief; (4) The State did not meet its affirmative burden of showing lack of improper jury conduct."

In considering the assignment of error, we begin with the observation that defendant's allegation that the jurors "committed misconduct by prematurely deliberating the case" is supported by nothing in the record except the written question delivered to the trial court by the bailiff. That question, as we interpret it, concerned two items that were evidently in the photograph but were

not among the pieces of jewelry received in evidence. In that regard, the unidentified juror who wrote the note was apparently more observant in examining the photograph than counsel had been, as there was no objection, when the photograph was offered in evidence, that it showed items that were not themselves in evidence.

■ Be that as it may, defendant would have us assume, from the written question alone, that the jurors (who were aware that their task during the recess was to examine the exhibits) went beyond that chore and began "deliberating the case." We are unwilling to draw such an inference.

Prior to the incident in question, the trial court, on two occasions, had admonished the jury not to discuss the case before it was submitted. The first occasion was just before a recess at the conclusion of the voir dire of the jury panel, when the trial court had read MAI–CR 2d 1.08(a). That had occurred at 10:23 a.m. The second occasion was just before the noon recess, when the trial court had read MAI–CR 2d 1.08(b). The noon recess had been taken at 11:45 a.m. Thus, within the space of less than 4 hours before the recess in question, the jury had twice been cautioned not to discuss the case.

In addition, nothing about the photograph or the various pieces of jewelry connected defendant with the crimes charged. That connection was supplied by the testimony of Gary Hatley, the testimony of Lisa Dale Roberts, defendant's attempt to avoid capture, his verbal threat to Gary Hatley, and his letter to Ronnie Hatley.

Furthermore, the record yields no clue as to whether the note was submitted at the behest of the entire jury or by one juror alone.

■ Defendant, with commendable ingenuity, seeks to avail himself of the rule that if jury misconduct takes place during the progress of a felony trial and before the case is submitted, the verdict must be set aside unless the State affirmatively shows that the jurors were not subjected to improper influences. The rule is found in, among other cases, *State v. Edmondson*, 461 S.W.2d 713, 723–24 (Mo.1971), and *State v. Jones*, 363 Mo. 998, 255 S.W.2d 801, 805–06 (1953). Defendant argues that the note indicates that jury misconduct in the form of "premature discussion" occurred in the instant case, therefore it became the State's duty to demonstrate the absence of prejudice.

We disagree. As explained earlier, we are unwilling to assume, from the note alone, that the jury had embarked on a discussion of defendant's guilt or innocence. The note concerned only the photograph of the jewelry; it did not pertain to anything connecting defendant with the crimes charged. The parties do not cite, nor has our independent research found, a Missouri case in which jury misconduct has been inferred from an incident such as this.

The jury misconduct that occurred in *Edmondson* and *Jones* was unauthorized communication between a juror and a third person (a defense witness in *Edmondson*, the sheriff in *Jones*). In *State v. Cooper*, 648 S.W.2d 137 (Mo.App.1983), cited by defendant, a juror left the jury room after the case had been submitted, and engaged in unauthorized conversation with the bailiff and with the trial judge. *State v. McCall*, 602 S.W.2d 702 (Mo.App.1980), also relied on by defendant, involved an allegation by the accused that he had overheard two jurors discussing the case before it was submitted. The trial court, after an evidentiary hearing, concluded that no such discussion had occurred, consequently the State had no duty to show the absence of improper influence.

Obviously, the conduct in issue in each of the cited cases was of an altogether different nature than the inquiry about the photograph in the instant case. We hold that none of the authorities relied on by defendant compel a finding that jury misconduct occurred here. That being so, the State had no duty to demonstrate absence of prejudice.

In reaching that conclusion, we do not endorse the unsupervised examination of exhibits by jurors. In *Eisenbarth v. Pow-*

*ell Bros. Truck Lines, Inc.,* 161 S.W.2d 263, 267[7] (Mo.1941), it is said that the practice of jurors examining exhibits when court is not in session should not be permitted. What occurred in the instant case demonstrates that problems can arise from such a practice.

 Here, however, the suggestion that the jurors examine the exhibits during a recess came from defense counsel, and defense counsel made no objection when the trial court instructed the bailiff to take the jurors and the exhibits to the jury room for that purpose. In view of the general rule that a party will not be permitted to take advantage of an error of his own making, *State v. Nenninger,* 354 Mo. 53, 188 S.W.2d 56, 58[5] (1945), and the rule that an objection and proper request for relief is a prerequisite to examination on appeal of matters arising at trial, *State v. Evans,* 639 S.W.2d 820, 822[2] (Mo.1982), defendant cannot be heard to complain about the unsupervised examination of the exhibits by the jury.

We recognize, of course, that the trial court, prior to the recess during which the incident occurred, should have repeated MAI–CR 2d 1.08(b). Rule 28.02(a), Missouri Rules of Criminal Procedure (15th ed. 1984). However, paragraph 3 of the Notes on Use (1983 Revision) under MAI–CR 2d 1.08 provides that if the court overlooks giving MAI–CR 2d 1.08(b), it is the duty of counsel to remind the court to give it. That requirement was in effect when this cause was tried. It is clear from the transcript that defense counsel did not request the trial court to read MAI–CR 2d 1.08(b) at the time the jurors and the exhibits were taken to the jury room, nor did defense counsel object to the trial court's failure to read said instruction.

*State v. Boyd,* 600 S.W.2d 97, 100[6, 7] (Mo.App.1980), squarely holds that in failing to object to the trial court's failure to read MAI–CR 1.08 at the first recess, the accused failed to preserve the matter for appellate review. The trial in *Boyd* occurred before the effective date of the requirement that counsel remind the court to give MAI–CR 2d 1.08(b) if the court overlooks it. It follows that if the point was waived in *Boyd* (at a time when counsel had not been assigned the duty of calling the omission to the court's attention), it was surely waived here.

For the foregoing reasons, we hold that the trial court did not err in denying defendant's motion for mistrial.

Judgment affirmed.

PREWITT, C.J., and FLANIGAN and MAUS, JJ., concur.