**STATE of Missouri, Respondent,**

v.

**Gregory WADE, Appellant.**

Nos. 14354, 14355.

Missouri Court of Appeals,
Southern District,
Division Two.

April 30, 1986.

Motion for Rehearing or Transfer
Denied May 21, 1986.

Application to Transfer Denied
July 15, 1986.

524

Susan L. Hogan, Columbia, for appellant.

William L. Webster, Atty. Gen., Paul La-Rose, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Gregory Wade ("defendant") was charged by information with the class C felony of burglary in the second degree, § 569.170, RSMo 1978, and was charged by another information with the class C felony of stealing a firearm, § 570.030.3(3)(d), RSMo Cum.Supp.1984. As demonstrated by the summary of the evidence, *infra*, both accusations arose from the same incident. The trial court consolidated the charges for trial, and defendant waived his right to trial by jury as to both charges. Rule 27.01(b), Missouri Rules of Criminal Procedure (16th ed. 1985). The trial court found defendant guilty of both charges, sentencing him to concurrent terms of two years' imprisonment. Defendant appeals from the burglary conviction (appeal 14355), and also from the stealing conviction (appeal 14354). His appeals were consolidated here, and he has filed one brief, raising two assignments of error.

The first assignment of error asserts the trial court wrongly denied defendant's motion for judgment of acquittal at the close of all the evidence, in that the evidence was insufficient to sustain a finding of guilty of burglary or a finding of guilty of stealing. Defendant's other assignment of error as-

serts the trial court wrongly denied defendant's application for a continuance, which defendant needed in order to secure the attendance of a vital witness. We address defendant's first point first.

Under Rule 27.01(b), *supra*, the trial court's findings have the force and effect of a jury verdict; consequently, our review is as though verdicts of guilty had been returned against defendant by a jury. *State v. Giffin*, 640 S.W.2d 128, 130[1] (Mo. 1982); *State v. Thornton*, 704 S.W.2d 251, 252 (Mo.App.1986). In determining the sufficiency of the evidence, we accept as true all evidence in the record tending to prove defendant's guilt, together with inferences favorable to the State that can reasonably be drawn therefrom, and we disregard all contrary evidence and inferences. *Giffin*, 640 S.W.2d at 130[2]; *Thornton*, 704 S.W.2d at 252. The test is whether the evidence, so viewed, is such that a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340[1] (Mo. banc 1982); *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

Viewed in accordance with those precepts, the evidence establishes that about 6:30 p.m., Saturday, December 15, 1984, Pernell Barwick and his wife left their home, 2104 Birkhead Road, in Poplar Bluff, to attend a Christmas banquet hosted by Barwick's employer, a local bank. The Barwicks locked their home, leaving their "outside floodlights," back porch light and carport light turned on.

Birkhead Road runs generally from west-northwest to east-southeast. The Barwick home is situated on the south side of Birkhead Road, and faces generally northeast by north. Proceeding southeasterly on Birkhead Road from the Barwick property, the next lot on the south side of Birkhead is 2102 Birkhead, on which is situated the home of J.P. and Mary Ellen McLane. Proceeding southeasterly on Birkhead from the McLane property, the next lot on the

south side of Birkhead is occupied by the Miles Hays residence. The east side of the Hays property abuts Euel Road, which runs generally north and south. Birkhead Road, passing in front of the Hays property, intersects Euel Road, but does not extend east of Euel.

Shortly after 7:00 p.m., December 15, Mary Ellen McLane looked out the back door of her home and observed two people "[m]oving very rapidly through my back yard." Her yard was illuminated by the lights from the Barwick property, and by a "large security light" at the corner between the McLane property and the Hays property. The backyard of the McLane home abuts the backyards of two residences lying generally south by southwest of the McLane property. Those two houses "also had lights on outside."

The lights enabled Mrs. McLane to see that the two individuals were carrying "a big white sack type thing and also a slender item." As the slender item "caught the light," Mrs. McLane noted it was shiny. Mrs. McLane opined that this object "could have been the barrel of a gun or numerous items." The white bag, according to Mrs. McLane, could have been a sheet or a pillowcase.

As the two individuals, heading southeast toward the Hays property, passed beneath one of the security lights, Mrs. McLane noticed they both were black, an she assumed both were males by reason of their clothing. Both were wearing trousers, and one was wearing "a sock cap type of thing." The clothing of the other was light colored.

Mrs. McLane, aware that no black people lived in the neighborhood, telephoned the police.

About 7:15 p.m., December 15, Poplar Bluff police officers Larry Baxter and Roy Lowe, in separate patrol cars, were on a parking lot along highway 67 a short distance from the subdivision where the Barwick, McLane, and Hays homes are situated. The officers received a dispatch about the activity in the subdivision, and immediately started in that direction.

Baxter explained that the subdivision lies west of the "Wal-Mart shopping mall area." An aerial photograph shows that Euel Road lies west of and parallel to the rear (west) property line of the mall, and that a strip of land lies between Euel and the mall boundary. This strip is divided into lots, lying side by side from south to north. The lots face Euel, and back up to the mall boundary. Some of the lots have houses; others are vacant. Immediately south of the mall, on land abutting the rear line of the two southernmost lots (both of which are unimproved), is the Oak Haven Women's Clinic.

Baxter, coming south on highway 67, drove into the Women's Clinic parking lot. Lowe turned into the subdivision and drove south to the corner of Lurlyn Road and Birkhead Road, which is the west terminus of Birkhead. There, Lowe turned east on Birkhead and drove past the Barwick, McLane, and Hays residences to Euel Road. Lowe turned south on Euel, and heard "[m]ovement in the wooded area," the vacant lots between Euel and the rear of the Women's Clinic. At this point, Lowe was about 500 feet from the McLane residence, and some 200 to 250 feet west of the Women's Clinic.

Lowe radioed Baxter that he (Lowe) had heard movement. Lowe directed his vehicle's "alley lights" into the area, and a few seconds later Baxter saw two black males running north behind houses situated on the east side of Euel Road. Baxter estimated the distance from his position to the duo as about 200 feet. Neither individual was carrying anything.

Baxter radioed this information to headquarters, then drove north to the rear of the shopping center, stopping behind the "P & N Hirsch Store." Lowe, who had overheard Baxter's radio transmission, started toward the rear of the Wal-Mart store.

Baxter, exiting his vehicle, heard a noise about 40 feet to his north. Baxter explained that an eight-foot-high chain link fence runs along the west boundary of the

mall, separating it from the subdivision. Along the fence, there are gaps at the bottom large enough for humans to crawl through. Baxter realized that the noise was the fence rattling. Baxter directed his flashlight toward the noise, and saw the two black males running north. He radioed this information to headquarters, then began pursuing the duo on foot.

Baxter overtook the pair at the north end of the rear of the Wal-Mart store, and ordered them to place their hands along the wall. One of them, later identified as William H. Thomas, complied. The other, later identified as defendant, "turned around and attempted to and then he turned and took off running again."

About that time, Lowe arrived and started after defendant while Baxter was handcuffing Thomas.

Defendant, pursued by Lowe, ran around a shoe store, where he was spotted by Sergeant Ricky Price of the Butler County sheriff's office, who had arrived at the scene with another deputy sheriff. Price joined the chase, overtook defendant, and subdued him. Defendant was wearing "a dark blue sock cap," "a blue pullover type sweatshirt," a white shirt, and blue jeans.

Thomas was wearing gloves, and was clad in blue trousers, a light colored shirt, and a light colored jacket.

Both suspects were taken to the police station.

Officers Baxter and Lowe, remaining at the scene, promptly returned to the site where Baxter had overtaken the suspects behind the Wal-Mart store. From there, the officers "backtracked," retracing the route the suspects had taken in reaching that point. When the officers arrived at, the location where Lowe had first heard the noise—the wooded area between Euel Road and the Women's Clinic—Baxter found two white bags lying on the ground beside a tree. A shotgun lay next to the bags. Baxter estimated the distance from the point where the fence had been rattled to the point where the bags and shotgun

lay as "[p]robably three hundred fifty feet, maybe."

The shotgun and bags were taken to police headquarters, where the bags' contents were examined. Among the contents were several pens bearing the name of the bank where Barwick was employed, together with a Christmas present to Barwick from a bank secretary, the wife of a city official.

The secretary and her husband were attending the same banquet as the Barwicks. Police contacted the secretary's husband at the banquet, and he informed the Barwicks that their home had been burglarized. The Barwicks thereupon departed the banquet and started home.

In the meantime, a police officer had been dispatched to the Barwick residence, and, upon arrival, had found that "[t]he rear door had been forced open." The officer entered, finding no one inside and the house "ransacked."

Detective Dennis Long of the Poplar Bluff police department went to the Barwick home, noting that the area around the lock in the rear door "had been splintered and broke." Long applied fingerprint powder to several areas in the home, hoping to find a legible impression. He discovered none, but did observe "many smudges." Long explained that "the powder adheres to greasy, sweaty substances."

While going through the home, Long noticed a "metal box that appeared to have been stomped on to get it open." Long "dusted" the box for evidence, observing there was "a possible tennis shoe print" on it. Long seized the box, returned to police headquarters, and saw that one of the shoes defendant was wearing had a tread similar to the print on the box. On Long's order, the clothing of both Thomas and defendant, along with defendant's shoes, were seized as evidence. Long noted that Thomas' gloves were "well worn, sweaty."

In addition to the items mentioned earlier, the bags found by Officer Baxter contained several bottles of wine, a bottle of whiskey, a man's wristwatch, and numer-

ous pieces of costume jewelry. Detective Long endeavored to lift fingerprints off the bottles. In doing so, he "found areas where the powder adhered and there was no discernible latent impressions." Long added, "The smudging that I discovered on the bottles are consistent with them being handled by the sweaty, greasy gloves or other similar type material."

Arriving at their home, which by now was being processed by the police officers, the Barwicks found it "in very much disarray." Every room had something on the floor, and "everything was torn up and ransacked."

Later, Pernell Barwick went to the police station and was shown the items Officer Baxter had found in the wooded area. Barwick identified the shotgun as his, having received it as a gift from his father. Barwick also identified the wristwatch as belonging to him, and the costume jewelry as belonging to his wife. Additionally, he recognized the Christmas gift the secretary had given him.

Barwick explained that he had a wine rack near his back door, and that there had been several bottles of wine in the rack. He identified the bottle of whiskey and the bottles of wine as items taken from his home. He was also shown the white bags, and identified them as pillowcases from a bed in his home, explaining that they were part of a matching sheet and pillowcase set.

Barwick was unacquainted with either Thomas or defendant, and he had not given them permission to enter his home or to remove anything therefrom.

Defendant's shoes, together with the metal box, were delivered to the Southeast Missouri Crime Laboratory, where they were examined by the laboratory director. After studying the impression on the box and an impression from the tread of one of defendant's shoes, the director concluded that the pattern on the box was the same as the pattern produced by the shoe. However, the director was unable to say that the print on the box was made by that specific shoe, to the exclusion of any other like shoe.

Defendant's motion for judgment of acquittal at the close of the State's evidence was denied. Defendant thereupon called Ivan Davis as a witness.

Davis explained that he resides at 1201 Euel Road, where Jackson Road intersects Euel. Jackson Road lies essentially parallel to Birkhead Road, and is the next street south of Birkhead. Jackson Road, like Birkhead Road, does not extend east of Euel. Davis' home, situated on the southwest corner of the intersection of Jackson and Euel, is almost due west of the Women's Clinic. The "wooded area"—the unimproved lots on the east side of Euel—is between Davis' home and the rear of the Clinic.

Davis testified that he knew defendant and Thomas, and that he had once hired Thomas to dig some postholes in the yard on Euel, and to help him when he moved to the Euel address in the fall of 1984. Davis, in times past, had hired defendant to do "odd jobs" at Davis' former home, and in connection with Davis' business.

According to Davis, defendant and Thomas had been told to contact him when they wanted work. Davis had a telephone with a listed number. Most of the time when defendant and Thomas wanted work, they contacted Davis by phone.

Davis had been to the home of defendant's aunt on the morning of December 15, 1984, and he vaguely remembered seeing defendant and Thomas there, but he was not positive.

Defendant, age 26 at time of trial, testified that he and Thomas arrived on foot at the home of Sandra Taylor, a "lady friend" of defendant's, about 6:30 p.m., December 15, 1984. While there, defendant drank some whiskey. He and Taylor departed about 6:45 or 6:50 p.m., their destination being Ivan Davis' home. Their purpose, according to defendant, was "[t]o talk to him about a job." Asked why he did not phone Davis, defendant replied that he did not know Davis' home number.

Defendant recalled that it was a ten-minute walk to Davis' home, and that the route he and Thomas took led across highway 67 and the shopping mall. Defendant explained that the fence at the rear of the mall does not extend all the way to the south end of the mall, and that he and Thomas walked to the south end of the fence, then down a "path" to Euel Road.

As they neared Davis' house, they saw his truck was gone. Consequently, according to defendant, they "turned around and walked back down the street." Then, said defendant, "As we got down I could see his truck, looked like the side of it going down the street that he lives on and I walked around and a police officer turned on his lights and I ran because I got paranoid being out there at that time." Defendant admitted he and Thomas ran past the first house on the east side of Euel, went under the fence, and continued north behind Wal-Mart. Defendant realized they were being chased, but was unaware their pursuers were police officers until he was overtaken by Sergeant Price. Asked why he ran from his pursuers, defendant responded: "I was a black person out there in that neighborhood and I knew something was going on. I really didn't want to be stopped for it. I didn't know something was going on, but I had a feeling when the policeman turned his lights on."

Defendant denied knowing where the Barwick home is, and he denied burglarizing anyone's house that evening.

In maintaining that the evidence was insufficient to support a conviction of burglary or stealing, defendant's first point states that "there was no evidence that [defendant] actively or affirmatively participated in the burglary and stealing, [defendant] was not in possession of any of the stolen property at the time of his arrest, the only evidence linking [defendant] to the burglary was a footprint which was not proven to be his, and the only evidence linking [defendant] to the stolen property were the smudges on the wine bottles taken from the Barwick residence."

Defendant relies on six circumstantial evidence cases in which convictions were reversed because of insufficient evidence: *State v. Prier,* 634 S.W.2d 197 (Mo. banc 1982), second degree burglary; *State v. Castaldi,* 386 S.W.2d 392 (Mo.1965), tampering with a motor vehicle; *State v. Cook,* 697 S.W.2d 272 (Mo.App.1985), second degree burglary; *State v. Mandina,* 675 S.W.2d 113 (Mo.App.1984), stealing over $150; *State v. White,* 665 S.W.2d 359 (Mo. App.1984), burglary in the second degree; and *State v. Aziz,* 647 S.W.2d 586 (Mo.App. 1983), second degree burglary. We have studied each of those cases, mindful that, as said in *Aziz:* "Of course, while the case law is instructive, each case is factually unique and must stand upon its own facts." 647 S.W.2d at 588[5]. Though the evidence in the instant case is entirely circumstantial, its strength is such that, in our view, the cases relied on by defendant are not controlling.

The offenses here obviously occurred between 6:30 p.m., when the Barwicks left their home, and the time that Officer Baxter found the stolen articles in the wooded area. While the latter hour is not specifically established, the record shows that Baxter responded to the dispatch at 7:15 p.m., and it is fairly inferable that his activities from then until he found the stolen articles did not consume any considerable amount of time. Pernell Barwick recalled that he was notified of the break-in "probably 8:00." Recognizing that it took time to take the pillowcases to the police station, examine their contents, and contact the city official at the banquet, and that it took the city official at least a minute or two to receive the message and inform the Barwicks, the trial court could have reasonably found that Baxter discovered the pillowcases and shotgun no later than 7:45 p.m. This compresses the time during which the offenses occurred to an hour and 15 minutes.

Defendant, by his own admission, was with Thomas from 6:30 p.m., until they were apprehended, some time after 7:15, so the record conclusively establishes that they were together throughout the greater

portion of the time during which the offenses had to have been committed.

Mrs. McLane, whose home is next door to the Barwicks', saw two black individuals in men's clothing in her backyard shortly after 7:00 p.m., carrying a white sack which, according to her, could have been a pillowcase, and also carrying a slender item which, she said, could have been a gun barrel. The two were hurrying away from the Barwick residence toward the area where Officer Baxter later found the stolen articles (a point, according to the scale on the aerial photograph, no more than 500 feet from the center of the McLane backyard). Although Mrs. McLane was unable to identify either Thomas or defendant at trial, she testified that one of the men in her backyard was wearing what appeared to be a sock cap, and that the other man had on light colored clothing.

Defendant and Thomas, when first sighted by Officer Baxter, were running north behind a house on Euel Road. That point, according to the aerial photograph, is within 450 feet of the center of the McLane backyard, in the direction the men were going when Mrs. McLane had seen them.

It is fairly inferable that defendant and Thomas were apprehended around 7:30 p.m., or shortly thereafter, which would have been within a half hour of the time that Mrs. McLane had seen the men in her backyard. When apprehended, defendant, a black man, was wearing a dark blue sock cap. Thomas, a black man, was clad in a light colored shirt and a light colored jacket. Those circumstances, of course, coincide with Mrs. McLane's descriptions.

Defendant conceded that he and Thomas were near the area where the shotgun and pillowcases were found. Defendant also admitted that he and Thomas had run behind the house where Officer Baxter had first observed the two fleeing black men. Defendant admitted that he and Thomas, during their flight, went beneath the fence behind Wal-Mart. The trial court could have reasonably found that the fence rattled as they did so, and that this was the rattle heard by Baxter. The distance from the point of the rattle to the site where the shotgun and pillowcases were found was, according to Baxter, approximately 350 feet. The items were found where Officer Lowe had heard movement, seconds before Baxter had seen the two men running north.

It must also be borne in mind that inasmuch as the Barwick burglary could not have begun before 6:30 p.m., and that some time was necessarily required for the perpetrator or perpetrators to gain entry, ransack the house, and place the items they wanted in the pillowcases, the intruders could not have departed the Barwick residence immediately after 6:30. Mrs. McLane's sighting of the two men in her backyard shortly after 7:00 p.m., fits comfortably into the logical time frame. This time factor, coupled with the fact that items Mrs. McLane saw the men carrying were consistent in appearance with the pillowcases and shotgun found by Officer Baxter, and identified by Pernell Barwick, supports an inference that the men Mrs. McLane saw were the burglars.

Defendant and Thomas, black men wearing articles of clothing resembling those on the two black men seen by Mrs. McLane, were the only black men observed by police in the area where the burglary occurred, a neighborhood populated solely by white residents. Another noteworthy circumstance is that Mrs. McLane testified it was a "warm evening," yet Thomas, when apprehended, was wearing gloves. We also cannot ignore the fact that Ivan Davis, to the best of his recollection, had seen defendant and Thomas at defendant's aunt's home on the morning of December 15. Had defendant been interested in work, one can reasonably assume he would have asked Davis then. Defendant, however, did not, in his testimony, mention seeing Davis that day. Defendant's explanation that he walked to Davis' house instead of phoning him because he did not know Davis' home phone number is dubitable in view of Davis' testimony that his number was listed.

The case against defendant is further strengthened by the fact that one of his shoes, or a shoe exactly like it, made the footprint on the metal box in the Barwick residence. Additionally, there were smudges in the Barwick residence and on the wine bottles that could have been made by the gloves Thomas was wearing.

■ Defendant admitted fleeing when he saw Lowe's police car. Defendant's flight was admissible to show a consciousness of guilt on his part. *State v. Kilgore*, 447 S.W.2d 544, 547[4] (Mo.1969); *State v. Chunn*, 701 S.W.2d 578, 585[4] (Mo.App. 1985). Its weight was for the trier of fact. *State v. Ball*, 339 S.W.2d 783, 784–85[2] (Mo. banc 1960); *Chunn*, 701 S.W.2d at 585[4].

■ We are keenly aware, of course, that where the State relies on circumstantial evidence to establish guilt, the facts and circumstances must not only be consistent with each other and with the hypothesis of guilt, but they must also be inconsistent with the accused's innocence and point so clearly and satisfactorily to guilt as to exclude every reasonable hypothesis of innocence. *State v. Hankins*, 642 S.W.2d 606, 614[10] (Mo.1982). We are likewise aware, however, that the circumstances need not be absolutely conclusive of guilt, nor need they demonstrate the impossibility of innocence. *State v. Goddard*, 649 S.W.2d 882, 884[2] (Mo. banc 1983), *cert. denied*, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983).

■ Applying those rules, and recognizing that a burglary conviction may be upheld on accumulated facts no one of which alone creates more than a suspicion of guilt, *State v. Berryhill*, 673 S.W.2d 444, 445[2] (Mo.App.1982), we hold that the circumstances heretofore enumerated, *in the aggregate*, are sufficient to support the trial court's findings of guilty. Defendant's first point is, accordingly, denied.

Defendant's second point insists that the trial court erred in denying defendant's application for a continuance, which he needed in order to subpoena Sandra Taylor. The background of this point is that at the outset of trial on March 4, 1985, defense counsel[1] announced that Ms. Taylor was not present, despite being notified by defense counsel to be there. Defendant agreed, however, that the trial court could hear the State's witnesses, together with defendant's witness Ivan Davis, and then adjourn to a later date when Ms. Taylor could be produced. Asked what would happen if Ms. Taylor were unavailable at the later date, defense counsel replied: "She is Mr. Wade's girlfriend and I would say that if the Court, after taking testimony today, sets out a date for a hearing I would write a subpoena for her and have her present." The trial court acquiesced in counsel's suggestion, and heard all of the evidence heretofore summarized. At the end of the day, the court announced that the proceedings would resume on March 12, 1985, at which time the court would hear any further evidence that defendant desired to present.

For reasons unexplained in the record, the trial did not resume on March 12. The record does disclose, however, that on March 12 a subpoena was issued for Ms. Taylor, showing that she could be served at the address where defendant had testified she was living at the time of the Barwick burglary. The subpoena commanded Ms. Taylor to appear and testify on March 26, 1985. It was returned by the sheriff unserved, bearing the notation "upon repeated attempts to serve her, she could not be found."

The docket sheet shows that on March 26, 1985, an application by defendant for a continuance was granted, and the cause was scheduled to resume April 1, 1985.

Another subpoena was issued for Ms. Taylor on March 28, 1985, commanding her to appear on April 1. That subpoena carried the same address as the earlier sub-

**1.** The attorney representing defendant on appeal is not the attorney who represented him at trial.

poena, with the additional information that Ms. Taylor could be served between 6:00 and 10:00 p.m. That subpoena was likewise returned by the sheriff unserved, stating: "After making a diligent search I was unable to locate Sandra Taylor."

The trial resumed as scheduled on April 1. Ms. Taylor did not appear. Defense counsel asked for another continuance, stating that defendant had informed him that Ms. Taylor no longer lived at the given address, which was the only place defendant knew to contact her.

Defense counsel informed the court that Ms. Taylor, if present, would testify that defendant and Thomas came to her house about 6:30 p.m., December 15, 1984, and left around 7:00. Additionally, said defense counsel, Ms. Taylor would testify she knew that defendant and Thomas were going to Ivan Davis' home for the purpose of seeking employment.

The trial court denied the application for a continuance. Defendant thereupon rested and moved for judgment of acquittal at the close of all the evidence, which motion was likewise denied.

■ An application for continuance in a criminal case is addressed to the sound discretion of the trial court, and an appellate court will not interfere unless it clearly appears that such discretion has been abused. *State v. Oliver*, 572 S.W.2d 440, 445[2] (Mo. banc 1978). One of the issues for the court to consider in ruling on such a motion is whether there is a reasonable probability that the personal presence of the witness will ever be obtained. *Id.* at 445[3].

■ Here, when Ms. Taylor did not appear at trial on March 4, 1985, the trial court granted defendant until March 12 to produce her. The time was thereafter extended to March 26, but a subpoena issued on March 12, two weeks prior to the March 26 date, could not be served on her. Another continuance was granted, postponing the proceedings until April 1. A subpoena for Ms. Taylor to attend on that date was issued March 28, but Ms. Taylor could not be located for service of that subpoena. On April 1, defendant conceded he was unaware of Ms. Taylor's whereabouts.

This case does not present a situation where a day-of-trial request for continuance was denied. Here, when Ms. Taylor failed to appear on the date the case went to trial, the trial court heard the other evidence, then allowed defendant four weeks thereafter to produce Ms. Taylor. During that interval, two subpoenas were issued for her, but the sheriff's office could not find her to serve either of them. On April 1, there was no information regarding her whereabouts that had been unavailable earlier. In these circumstances, we cannot convict the trial court of error in declining to delay matters further.

We have examined the three cases cited by defendant, but they are unavailing, as the denials of continuances in all of them were upheld.

Defendant's second point is denied, and the convictions are affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.